# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**Danny S.,**
**Petitioner Below, Petitioner**

**FILED**

January 30, 2015

**RORY L. PERRY II, CLERK**
**SUPREME COURT OF APPEALS**
**OF WEST VIRGINIA**

**vs)   No. 13-0946** (Nicholas County 02-C-13)

**David Ballard, Warden, Mt. Olive Correctional Complex,**
**Respondent Below, Respondent**

## MEMORANDUM DECISION

Petitioner Danny S.,[1] appearing *pro se*, appeals the following three orders of the Circuit Court of Nicholas County: (1) a January 28, 2007, order that denied certain grounds for relief in petitioner's habeas corpus proceeding; (2) an August 15, 2013, order that denied the remaining grounds in petitioner's habeas proceeding; and (3) an August 15, 2013, order that denied the motions petitioner filed *pro se* in his habeas proceeding. Respondent David Ballard, Warden, Mt. Olive Correctional Complex, by counsel Laura Young, filed a response, and petitioner filed a reply.

The Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's orders is appropriate under Rule 21 of the Rules of Appellate Procedure.

On January 11, 2000, a Nicholas County grand jury returned a seventy-nine count indictment against petitioner charging him with sexual offenses against E.S., petitioner's minor stepdaughter. The offenses were allegedly committed between 1991 and 1999, when E.S. was between age 6 and age 14.

Petitioner's trial occurred in August of 2000 after petitioner refused a plea agreement. Although the jury returned a verdict on the first evening of deliberations, the circuit court had earlier given a modified *Allen* charge[2] and indicated that it generally expected a jury to deliberate

---

[1] Consistent with our practice in cases involving sensitive facts, we use only petitioner's first name and last initial, and identify the minor victim only by her initials. *See State ex rel. W.Va. Dept. of Human Services v. Cheryl M.*, 177 W.Va. 688, 689 n.1, 356 S.E.2d 181, 182 n.1 (1987).

[2] *See Allen v. United States*, 164 U.S. 492 (1896) (approving of the charge read to a deadlocked jury).

as long as the trial lasted to see if a verdict would be reached (in this case, three days). The jury found the petitioner guilty of twenty-seven counts: (1) one count of first degree sexual assault, (2) twelve counts of first degree sexual abuse, (3) nine counts of second degree sexual assault and (4) five counts of sexual abuse by a parent, guardian or custodian.[3] On October 18, 2000, the circuit court sentenced petitioner to fifty-six to one hundred twenty years in the state penitentiary.

Petitioner filed a petition for writ of habeas corpus in 2002. Successive appointments of counsel occurred. On January 18, 2007, the circuit court denied habeas relief on the following grounds: (a) that petitioner's indictment was not defective; (b) that petitioner was not denied his right to cross examine E.S., or his right to present witnesses and evidence in his defense; (c) that it was not improper for the circuit court to give the modified *Allen* charge; and (d) that petitioner was not punished for refusing to a plea bargain. The circuit court specified that its order was not a final order because the issue of ineffective counsel required further adjudication. Subsequently, petitioner was permitted to raise two additional issues: (1) whether the State fabricated serology evidence;[4] and (2) whether petitioner was inadequately informed of the nature of a *Kennedy* plea before he rejected a plea agreement.[5]

The circuit court held evidentiary hearings on February 27, 2007, and April 20, 2007, at which petitioner represented himself with standby counsel in attendance. Petitioner's trial counsel testified. On June 13, 2007, the circuit court directed petitioner to file a brief within thirty days of the mailing of the hearing transcripts to him. Petitioner did not file a brief, but did file various *pro se* motions to (a) stay the habeas proceeding; (b) hire an independent DNA expert; (c) hold additional evidentiary hearings; (d) to extend the briefing schedule; (e) to reconstruct the record due to a missing transcript pursuant to Rule 80(e) of the West Virginia Rules of Civil Procedure; (f) reschedule an evidentiary hearing; (g) appoint new habeas counsel; and (h) redo the habeas proceeding from the beginning.

A status conference and a final habeas corpus hearing were held on March 26, 2013, and May 22, 2013, respectively. At the May 22, 2013 hearing, the circuit court granted standby counsel's motion to withdraw completely from the case. In making the motion to withdraw, counsel cited (1) a lack of communication between petitioner and counsel; and (2) ethical obligations requiring them not to pursue frivolous claims. The circuit court granted counsel's motion. In a thirty-five page order, entered August 15, 2013, the circuit court rejected petitioner's claims of (a) ineffective assistance of counsel; (b) serology evidence;[6] and (c) the *Kennedy* plea. In

---

[3] The other counts of the indictment were dismissed by the State prior to trial.

[4] *See In the Matter of: Renewed Investigation of State Police Crime Laboratory, Serology Div.*, 219 W.Va. 408, 633 S.E.2d 762 (2006).

[5] *See Kennedy v. Frazier,* 178 W.Va. 10, 357 S.E .2d 43 (1987).

[6] Both serology evidence and DNA testing are discussed in the record. Petitioner's DNA was found on a fuzzy blanket and a sheet seized during a police search of petitioner's residence.

a second order, also entered August 15, 2013, the circuit court denied petitioner's *pro se* motions. The circuit court designated both August 15, 2013, orders as appealable orders that finally disposed of petitioner's habeas case.

Petitioner now appeals the circuit court's denial of his habeas petition. We review a circuit court's order that denies a habeas petition under the following standard:

> In reviewing challenges to the findings and conclusions of the circuit court in a habeas corpus action, we apply a three-prong standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard; the underlying factual findings under a clearly erroneous standard; and questions of law are subject to a *de novo* review.

Syl. Pt. 1, *Mathena v. Haines,* 219 W.Va. 417, 633 S.E.2d 771 (2006).

On appeal, petitioner argues that he should have been granted habeas relief because (1) it was improper for the circuit court to give the modified *Allen* charge; (2) petitioner was punished for not agreeing to a plea bargain;[7] (3) petitioner was denied effective assistance of counsel; and (4) petitioner was denied his right to cross examine E.S. about (a) her motive to lie, and (b) the dismissed counts of the indictment that were based on proven false accusations. Respondent warden counters that the record does not reflect the State's reasons for dismissing the other counts of the indictment and that the circuit court's denial of petitioner's habeas petition should be affirmed. We agree and find that the circuit court's three orders adequately refuted all of petitioner's claims and properly denied his petition.

Having reviewed (1) the circuit court's "Order Denying Writ of Habeas Corpus on All Grounds Except Ineffective Assistance of Counsel and Setting Evidentiary Hearing," entered January 18, 2007; (2) the circuit court's "Final Order Denying Writ of Habeas Corpus and Dismissing Case," entered August 15, 2013; and (3) the circuit court's "Order Denying Petitioner's Motions," entered August 15, 2013, we hereby adopt and incorporate the circuit court's well-reasoned findings and conclusions as to the assignments of error raised in this appeal. The Clerk is directed to attach copies of the circuit court's orders to this memorandum decision.[8]

For the foregoing reasons, we affirm.

Affirmed.

---

[7] Petitioner also discusses his *Kennedy* plea issue as part of this assignment of error.

[8] Certain names in the orders have been redacted. *See* fn. 1.

3

**ISSUED:**   January 30, 2015

**CONCURRED IN BY:**

**Chief Justice Margaret L. Workman**
**Justice Robin Jean Davis**
**Justice Brent D. Benjamin**
**Justice Menis E. Ketchum**
**Justice Allen H. Loughry**


STATE OF WEST VIRGINIA, ex. rel.
DANNY

      Plaintiff,

v.                                     CASE NO. 02-C-13

THOMAS L. McBRIDE, Warden,
MT. OLIVE CORRECTIONAL COMPLEX

      Defendant.

## ORDER DENYING WRIT OF HABEAS CORPUS ON ALL GROUNDS EXCEPT INEFFECTIVE ASSISTANCE OF COUNSEL AND SETTING EVIDENTIATY HEARING

This matter came before this Court on the petition of Danny and was brought under the provisions of West Virginia Code § 53-4A-1, *et seq.*, as amended. The Petitioner seeks to obtain post-conviction habeas corpus relief from a sentence imposed by this Court on September 29, 2000.

### Factual and Procedural Background

The Petitioner was indicted on January 11, 2000 by the grand jury on one (1) count of sexual assault in the 1st degree, thirteen (13) counts of sexual abuse in the 1st degree, fifteen (15) counts of sexual assault in the 2nd degree, and fifty (50) counts of sexual abuse by a parent, guardian, or custodian. The original indictment included 79 Counts. Prior to the trial, the Court dismissed counts 35-79. The case proceeded to trial in August of 2000 on 27 counts, and the jury returned a verdict of guilty on the following counts: one (1) count of Sexual Assault in the First Degree, twelve (12) counts of Sexual Abuse in the First Degree, five (5) counts of Sexual Abuse by a Parent, Guardian, or Custodian, and nine (9) counts of

CIVIL ORDER BOOK 144 PAGE 234
ENTERED 1-18-07 -97-

Sexual Assault in the Second Degree. On September 29, 2000, the Court imposed the following sentence: not less than fifteen (15) nor more than twenty-five (25) years for Sexual Assault in the First Degree as contained in Count one; not less than one (1) nor more than five (5) years for twelve (12) counts of Sexual Abuse in the First Degree as contained in Counts two, four, five, seven, eight, nine, ten, fifteen, sixteen, twenty-two, twenty-three, and twenty-five, said sentences to concurrently with each other and consecutive to the sentence for Sexual Assault in the First Degree; not less than ten (10) nor more than twenty-five (25) years for the 9 counts of Sexual Assault in the Second Degree contained in counts eleven, thirteen, eighteen, nineteen, twenty, twenty-four, twenty six, twenty-seven, and thirty-three, with the sentences for counts eleven and thirteen to run consecutively to each other and consecutive to the sentence imposed on counts one and two and the sentences imposed on counts eighteen, nineteen, twenty, twenty-four, twenty-six, twenty-seven, and thirty-three to run concurrently with each other and concurrently with the sentence imposed in counts eleven and thirteen; not less than ten (10) nor more than twenty (20) years for counts twenty-one and thirty-four, Sexual Abuse by a Parent, Guardian, or Custodian, with the sentences to run consecutively with each other and the sentence imposed on counts one, two, eleven, and thirteen; not less than five (5) nor more than ten (10) years for count three, Sexual Abuse by a Parent, Guardian, or Custodian, with the sentence to run concurrently with the sentences imposed on counts twenty-one and thirty-four; not less than five (5) nor more than fifteen (15) years for counts six and fourteen, Sexual Assault by a Parent, Guardian, or Custodian, said sentence to run concurrently with each other and concurrent with the sentences imposed on counts twenty-one and thirty-four. The Petitioner appealed this conviction and sentence to the

CIVIL ORDER BOOK _144_ PAGE _235_
ENTERED _1-18-07_

2

-98-

Supreme Court of Appeals of West Virginia, which denied the Petitioner appellate review on November 7, 2001.

The Petitioner's first lawyer was Randall W. Galford, who was appointed habeas counsel on March 14, 2002 and was also counsel for the Petitioner during his criminal trial. On July 27, 2002, Mr. Galford was allowed to withdraw as counsel and Gregory S. Hurley was appointed as his new counsel. Mr. Hurley was later replaced by David Karickhoff. The original habeas corpus petition was filed on November 1, 2002, by the Petitioner's court-appointed counsel, David Karickhoff. On June 4, 2003, a Motion to Withdraw as Counsel was made by Mr. Karickhoff and that motion was granted on June 27, 2003. After Mr. Karickhoff withdrew, the court appointed Gregory L. Ayers of the Kanawha County Public Defenders Office as counsel. On April 10, 2006, Petitioner, through his attorney, filed an Amended Petition for Writ of Habeas Corpus and a Memorandum in Support of Amended Petition for Writ of Habeas Corpus. On May 15, 2006, the State filed a motion to require Petitioner to utilize a "Losh list" pursuant to *Losh v McKenzie*. No response was made to this motion.

After carefully considering the documents submitted by the parties, along with all of the evidence and arguments presented in connection therewith, for those reasons explained in the following Opinion, the Court has concluded that the Petitioner has failed to establish any basis for the requested post-conviction relief, with the possible exception of ineffective assistance of counsel.

### Petitioner's Grounds for Habeas Corpus Relief

In the most recent petition filed by counsel the Petitioner asserted the following grounds for post-conviction habeas corpus relief: defective indictment, improperly denied the

right to cross examine and present witnesses and evidence in his defense, improper reading of deadlock instruction, and the sentence imposed was punitive in nature. The Petitioner later raised the ground of ineffective assistance of counsel, which will be addressed below.

## Discussion

**Ground I:** *Indictment was Defective as it Failed to Allege the Essential Facts Constituting the Specific Offenses*

With respect to the Petitioner's first claim, that the indictment was defective because it failed to allege essential facts constituting the specific offense for which he was charged, the Court has considered all of the evidence and arguments presented and concluded that the Petitioner has failed to prove that he is entitled to relief on the basis of alleged defective indictment. The reasons for this conclusion, as well as the findings of fact and legal authority upon which the conclusion is based, are set forth below.

To prevail in post-conviction habeas corpus proceedings, the "Petitioner has the burden of proving by a preponderance of the evidence the allegations contained in his petition or affidavit which would warrant his release." *Syllabus Point 1, Scott v. Boles,* 150 W. Va. 453 (1966). Regarding the Petitioner's claim that the indictment was defective, the Petitioner claims that because the indictment spoke only in terms of "sexual contact", "sexual intrusion", and "sexual intercourse" and not the specific acts actually engaged in, that the indictment failed to sufficiently inform the defendant of the offenses with which he is charged.

An indictment need only meet minimal constitutional standards, and the sufficiency of an indictment is determined by practical rather than technical considerations." Syllabus Point 2, *State v. Miller,* 197 W.Va. 588, 476 S.E.2d 535 (1996). The West Virginia Supreme Court of Appeals has held that, "An indictment for a statutory offense is sufficient if, in

charging the offense, it substantially follows the language of the statute, fully informs the accused of the particular offense with which he is charged and enables the court to determine the statute on which the charge is based." Syllabus Point 3, *State v. Hall*, 172 W.Va. 138, 304 S.E.2d 43 (1983).

The standard to determine whether an indictment is sufficient depends on whether or not the defendant challenged the indictment prior to trial. *State v. Miller* announced a more liberal test to apply if there was not timely objection to the indictment. In *Miller*, the court said, "Without objection, the indictment should be upheld unless it is so defective that it does not, by any reasonable construction, charge an offense under West Virginia law or the specified offense for which the defendant was convicted." *State v. Miller*, 197 W.Va. 588 at 598, (1996). In *State v. Wallace*, a stricter test was set forth in cases where the indictment was challenged prior to the trial. That test states that, a[n] indictment for a statutory offense is sufficient on its face if, in charging the offense, (1) it substantially follows the language of the statute, (2) fully informs the accused of the particular offense with which he is charged and (3) enables the court to determine the statute on which the charge is based. *State v. Wallace* 205 W. Va. 166, (1999). In the instant case, the Petitioner did challenge the indictment prior to trial.

In *State v. David D. W.*, the West Virginia Supreme Court of Appeals dealt with a case very similar to this case. The defendant, David D. W., was convicted of 38 counts of first degree sexual assault, 38 counts of incest, 38 counts of sexual abuse by a parent, guardian, or custodian, and 38 counts of first degree sexual abuse. *State v. David D. W.*, 214 W.Va. 167, 588 S.E.2d 156(2003). The defendant claimed that the indictment returned by the grand jury was insufficient because it was not plain, concise, or definite. *Id.* at 172. The court stated

that, "This Court has held that, "An indictment for a statutory offense is sufficient if, in charging the offense, it substantially follows the language of the statute, fully informs the accused of the particular offense with which he is charged and enables the court to determine the statute on which the charge is based."" *Id.*, citing *State v. Hall*, 172 W.Va. 138, 304 S.E.2d 43 (1983). The court in *State v. David D. W.* held that the indictment in that case was sufficient. In the present case, the underlying criminal charges are substantially similar, as are the grounds raised on appeal. In both cases, the indictment substantially followed the language of the statutes under which the Petitioner was charged.

Furthermore, the indictment is valid even if it did not contain the level of specificity that the Petitioner claims is necessary in this ground. The terms "sexual intrusion," "sexual contact," and "sexual intercourse" are sufficient to apprise the defendant of the offense with which he is charged and provides enough information for him to prepare a defense for trial. As was stated in *State v. Meadows*, "Any lack of specificity with regard to details in an indictment are discoverable upon a proper motion for a bill of particulars." *State v. Meadows* 172 W.Va. 247 (1983). Here, the Petitioner sought for and received a bill of particulars. The defendant had the original indictment plus the bill of particulars prior to trial to help prepare his defense.

In this case, the indictment substantially followed the language of the statutes under which the Petitioner was charged, therefore the Petitioner's requested relief on this ground is denied. The Petitioner was informed of the nature of the offenses he allegedly committed, the statutes he allegedly violated, and the manner in which he allegedly violated said statutes.

The Petitioner makes another argument that because the language used in different counts of the indictment are substantially the same, that he was unable to determine which

acts led to an indictment on that count. This is very similar to the argument made above. Again, all that is required of an indictment is sufficient on its face if, in charging the offense, (1) it substantially follows the language of the statute, (2) fully informs the accused of the particular offense with which he is charged and (3) enables the court to determine the statute on which the charge is based. *State v. Wallace* 205 W. Va. 166, (1999).

These three criteria were met in the instant case. The indictment in this case met the standards of a valid indictment. The indictment was sufficient to apprise the defendant of the charges against him. Any details the defendant may have found lacking were cleared up by the bill of particulars. The bill of particulars that was provided informed the defendant of the specifics behind each count of the indictment and afforded him the opportunity to prepare his defense accordingly. After reviewing the record, it is clear that the defendant was able to determine the charges and to prepare his case accordingly. The indictment in this case was valid and any relief on this ground is denied.

**Grounds II and III**: *Petitioner was Denied Cross-Examination        and Denied his Right to Present Witnesses and Evidence in his Defense*

The Petitioner also asserts that he was improperly denied his right to cross examine as to her motives to lie based on his prohibiting her from smoking marijuana and practicing witchcraft. The Sixth Amendment of the United States Constitution guarantees the right of an accused in a criminal proceeding to be confronted with the witnesses against him. *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986). This right was applied to the states through the Fourteenth Amendment and contained within this right is the defendants right to cross-examination. *Pointer v. Texas*, 380 U.S. 400 (1965). Also, in *State v. McIntosh*, the court held, "A witness may also be cross-examined about matters affecting his credibility. The

term "credibility" includes the interest and bias of the witness, inconsistent statements made by the witness and to a certain extent the witness' character." *State v. McIntosh*, W.Va. 561, 576 (2000).

Petitioner is correct in his assertion that under W. Va. R. Evid. 608(b), specific instances of conduct may be inquired into on cross-examination if they are probative of truthfulness or untruthfulness, however, it is allowable at the discretion of the trial judge. West Virginia Rule of Evidence 608(b) states that,

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of a witness other than the accused (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

Rule 608(b) allows specific instances of conduct for the purpose of attacking character to be inquired into on cross-examination, but at the discretion of the court. In this case, the Court did not totally disallow cross-examination. Rather, the court simply refused to let the Petitioner inquire about two areas, those areas being the victim's regular usage of marijuana and possible participation in devil worship, as these did not involve her character for truthfulness or untruthfulness. In the criminal trial against Petitioner, the Court ruled that the areas of marijuana use and practice of witchcraft or devil worship by the victim were irrelevant and improper. Tr. Vol. III 67-72; Tr. Vol. IV 90-91; Tr. Vol. IV 7. The Petitioner was not denied his rights under the Confrontation Clause nor does the Confrontation Clause demand admissibility of such evidence. The Petitioner was given ample ability to relate the conflicts he had wit̄          bout dating, her behavior, her dress, and other topics, both on his direct testimony and the cross-examination c          Tr. Vol. III 63-73, Tr. Vol. 1 156-

157. The only areas that the Court prohibited the Petitioner to testify about dealt with specific instances of conduct, which are disallowed by West Virginia Rule of Evidence 608(b).

The accusations of witchcraft and regular use of marijuana were attempts to question the victim's character in areas other than her truthfulness. The Court allowed the Petitioner to testify about his belief that the victim had used marijuana on the date of the incident as well as other conflicts between the Petitioner and the victim and also allowed the Petitioner to inquire into those areas during cross-examination of the victim. The Petitioner had a full opportunity to develop his defense concerning the credibility of the victim on other issues. Accordingly, the Court concludes that the Petitioner is not entitled to the requested relief on the basis of alleged denial of cross-examination.

Petitioner also makes a related claim that the Court prevented Petitioner from putting on a defense by not allowing Petitioner to call Richard Dillon as a witness and restricting the testimony of Alan Hughes and Pamela Rapp. Petitioner contends that via an improper application of W. Va. R. Evid. 608(b), he was denied his right to present very relevant, important defense evidence tha                nad a motive to lie. Richard Dillon's testimony was only going to establish that he ›        had been on five or six dates. Tr. Vol. III 115-117. The fact tha        had been on dates despite being prohibited from doing so by Petitioner had already been established through the course of the trial. Mr. Dillon was not going to provide any new and relevant information and the Court sustained the relevancy objection.

West Virginia Rule of Evidence 401 states "relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *West*

*Virginia Rule of Evidence* 401. In this case, the testimony would not have any tendency to make the existence of any fact that is of consequence because the fact that the Petitioner sought to prove was already in the recor         admitted that she went on dates with boys and met them at the movie theatre. Tr. Vol. III 116-117. This was the only fact that Petitioner wished to elicit from Mr. Dillon and because of this, the Petitioner cannot receive the relief requested on this ground.

Petitioner also contends that the restriction of the testimony of Alan Hughes and Pamela Rapp was improper. The Petitioner sought to introduce specific instances of character with these two witnesses. Tr. Vol. III 119-121. West Virginia Rule of Evidence 608(a) states that: " The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness; and (2) evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise." *West Virginia Rule of Evidence* 608(a). Specific instances of character are not allowed to attack the credibility of a witness. Only opinion and reputation evidence may be used and both witnesses gave their opinions about truthfulness. Also, both witnesses testified about their opinion of the Petitioner's lustfulness, the character trait at issue. Tr. Vol. III 122-133. The testimony of the witnesses in question were only limited because the Petitioner wished to use them to speak of specific instances of conduct, which the West Virginia Rules of Evidence do not allow. Therefore, the Court concludes that the Petitioner is not entitled to the requested relief on the basis he was denied the right to put on a full defense.

CIVIL ORDER BOOK _144_ PAGE _243_
ENTERED _1-18-07_ 10_

— 106—

**Ground IV**: *The Reading of the Deadlock Jury Instruction*

Petitioner claims that the reading of the deadlock instruction coerced the jury into finding the Petitioner guilty. The jury had deliberated from Four O'clock until Eight O'clock in the evening and had not yet reached a verdict. The Court brought the jury back into the Courtroom for the purpose of determining whether the jury wished to continue their deliberations or retire for the evening and resume deliberations tomorrow. Prior to doing so, the Court informed counsel that: "I propose we bring the jury in and determine what they want to do the rest of the evening. And if they want to stay, I propose reading the deadlock instruction I gave both of you." Tr. Vol. V 74.

*State v. Shabazz* discusses the rule for the *Allen* instruction or the deadlock verdict. *Shabazz* states that "[when] the trial court addresses the jury urging a verdict, but does not use language the effect of which would be to cause the minority to yield its views for the purpose of reaching a verdict, the trial court's remarks will not constitute reversible error." *State v. Shabazz* 206 W.Va. 555, 559, 526 S.E.2d 521,525 (1999). In the instant case, the Court directed its form of the deadlock instruction to the entire jury and did not single out any minority. Tr. Vol. V 76-78.

However, in the instant case, Petitioner claims that the fact that the jury returned less than 30 minutes later with a verdict on 27 counts clearly demonstrates the coercive effect the instruction had on the jury. However, a short deliberation time after the reading of the deadlock instruction is not conclusive proof of the coercive effect of the instruction. In *State v. Blessing*, the court was faced with a similar situation. The court in *Blessing* did not feel that the jury had had enough time to deliberate and called the entire jury in to see if they wished to continue deliberating or retire for the day and come back Monday. *State v. Blessing*

175 W.Va. 132, 134, 331 S.E.2d 863, 865 (1985). After giving the jury a deadlock instruction the court ordered the jury back to the jury room to decide what they wanted to do. *Id.* The jury returned 45 minutes later with a verdict of guilty of second-degree murder. The actions in *Blessing* were not considered reversible error by the West Virginia Supreme Court of Appeals.

The facts in *Blessing* are analogous to what happened in the instant case. However, another point made in *Blessing* was that whether or not a trial court's instructions constitute improper coercion depends on the facts and circumstances of the particular case and cannot be determined by any general or definite rule. *Id.* at 134. The Petitioner claims that the lateness of the hour when the deadlock instruction was given combined with the fact that an alternate juror was going to replace a juror if the deliberations continued past that night influenced the jury's decision. However, the jurors in Blessing were also faced with a late hour when the instruction was given. Also, in this case, the Court carefully instructed the jurors not to give up their conscientious conviction merely for the sake of reaching a verdict. In addition, the remarks of the Court were not addressed to a minority and the Court did not express any opinion of how the case should come out. The full text of the deadlock instruction is as follows:

> At the outset, I want each of you to know that although you have a duty to reach a verdict, if that is possible, I have neither the power nor the desire to compel agreement upon a verdict.
> The purpose of these remarks is to point out to you the importance and the desirability of reaching a verdict in this case, provided, however, that you, as individuals, can do so without surrendering or sacrificing your conscientious scruples or personal convictions.
> You will recall that upon assuming your duties as jurors in this case, each of you took an oath. That oath places upon each of you, as individuals, the responsibility of arriving at a true verdict upon the basis of your opinion and not merely acquiescence in the conclusions of your fellow jurors.

However, it, by no means, follows that the opinion may not be changed by conference in the jury room. The very object of the jury system is to reach a verdict by a comparison of views and by considerations of the proofs with your fellow jurors.

During your deliberations, you should be open-minded and consider the issues with proper deference to and respect for the opinions of each of the others; and you should not hesitate to reexamine your views in the light of such discussions.

You should consider also that this case must, at some time, be terminated; that you are selected in the same manner and from the same source from which any future jury must be selected; that there is no reason to believe that this case will ever be submitted to twelve more intelligent, more impartial or more competent people to decide it; or that more or clearer evidence will ever be produced on one side or the other of this case.

I'm going to ask now that you retire to your jury room, taking as much time as is necessary for further deliberations upon the issues submitted to you for your determination.

Now, if you wish to adjourn for the evening, that is fine with me and we will call the alternate juror and begin deliberations in the morning. If you want to go back and continue deliberations, you may do that.

So, I'm going to leave that entirely up to you, Mr. Foreperson. You can go back and poll your jurors, and you need to let me know your decision, but I do not intend to terminate your deliberations for some time yet. So, you may return to your jury room.

Furthermore, this case differs from *Blessing* in that the Court left it entirely up to the jury as to whether they wished to continue to deliberate or quit for the evening. The jury itself chose further deliberation. Accordingly, the Court concludes that the Petitioner is not entitled to the requested relief on the basis of the deadlock instruction.

**Ground V:** *When imposing the sentence, the trial court punished Swager for not accepting a plea.*

The Petitioner claims that the Court made statements that attempted to get the Petitioner to accept a plea bargain and that the Petitioner was punished for exercising his right to a jury trial. The Petitioner points to statements made by the Court that he claims conveys that the Court had become an advocate for the suggested resolution. Petitioner claims that the Court said that he was taking a chance if convicted at trial of "never getting out of prison" and asking the Petitioner, "so you're trading your life for fifteen years?" The Petitioner also says

that the Court telling a story about a defendant who died in prison after rejecting a plea made by the Judge when he was a prosecutor is further evidence that the Court was trying to force the defendant to accept a plea.

The Petitioner claims that these statements were made to inform the Petitioner that if he rejected this plea and proceeded to trial, that the Court would punish the Petitioner and sentence him to the maximum sentence because the Court said, "I've always sentenced to the maximum in cases of this type." However, when the Court sentenced the Petitioner, the Court did not sentence him to the maximum, choosing instead to run many sentences concurrently.

A clear reading of the record demonstrates that the Court never intended to punish the Petitioner for rejecting the plea and proceeding to trial. Every statement the Court made was to merely inform the Petitioner of the potential risks that lay ahead if he proceeded to trial and to let the defendant know that nothing is certain when you proceed to trial.

In *Kennedy v. Frazier*, the court acknowledged that, "the proposition that a guilty plea that represents a voluntary and intelligent choice among the alternatives available to a defendant is not coerced within the meaning of the Fifth Amendment simply because it was entered into to avoid the possibility of a significantly higher penalty." *Kennedy v. Frazier*, 178 W.Va. at 12, 357 S.E.2d at 45. While *Kennedy* dealt with the court's ability to accept or reject a plea, the language the court used is relevant in the instant case.

In addressing Petitioner, the Court was making a reasonable effort to avoid the possibility that a significantly higher penalty might be imposed on him in this case. While the Petitioner raises the Court's actions as a possible grounds for habeas relief, in fact, the Court was attempting to ensure that the Petitioner fully understood the terms of the offered plea

agreement and the risks he was facing if he proceeded to trial. Accordingly, the Court concludes that the Petitioner is not entitled to the requested relief on this ground.

**ORDERS**

1. All grounds in the Petitioners Amended Petition for Writ of Habeas Corpus are **DENIED**, with the exception of the ineffective assistance of counsel claim raised both in the Amended Petition for Writ of Habeas Corpus filed by counsel on April 10, 2006 and the pro se Writ of Habeas Corpus filed by the Petitioner himself on November 1, 2002.

2. An evidentiary hearing concerning the ineffective assistance of counsel claim will be heard on February 27, 2007 at 1:00 O'clock P.M. The Petitioner must file all grounds to be heard on or by February 7, 2007. All grounds not raised by February 7, 2007 will be waived.

3. This is not a final order and any time to file an appeal will not begin until the entry of a final order on all issues.

4. The Clerk is hereby directed to transmit a copy of this order to: Mark D. Hudnall, Esq., Nicholas County Prosecuting Attorney, 203 Courthouse Annex, 511 Church St., Summersville, WV 26651, and Gregory L. Ayers, Office of the Public Defender, P.O. Box 2827, Charleston, WV 25330

done
1-18-07
1-18-07

ENTER: 1-18-07

Hon. Gary L. Johnson, Circuit Judge

CIVIL ORDER BOOK _144_ PAGE _248_
ENTERED _1-18-07_
15

- 111 -

(193)

## IN THE CIRCUIT COURT OF NICHOLAS COUNTY, WEST VIRGINIA

CIRCUIT CLERK
NICHOLAS COUNTY, WV
2013 AUG 15 PH 2: 21

STATE OF WEST VIRGINIA, ex. rel.

DANN

       Petitioner,

v.                                        CIVIL ACTION NO. 02-C-13

DAVID BALLARD, Warden,
MT. OLIVE CORRECTIONAL COMPLEX,

       Respondent.

## FINAL ORDER DENYING WRIT OF HABEAS CORPUS AND DISMISSING CASE

      This matter came before this Court on the petition of Dann         and was brought under the provisions of West Virginia Code § 53-4A-1, *et seq.*, as amended. The Petitioner seeks to obtain post-conviction habeas corpus relief from a sentence imposed by this Court on the 29th day of September, 2000.

### I.  Factual and Procedural Background

    1.      On January 11, 2000, the Grand Jury indicted the Petitioner on one (1) count of sexual assault in the 1st degree, thirteen (13) counts of sexual abuse in the 1st degree, fifteen (15) counts of sexual assault in the 2nd degree, and fifty (50) counts of sexual abuse by a parent, guardian, or custodian. The original indictment included seventy-nine (79) counts. Prior to trial, the Court dismissed Counts 35-79.

    2.      Pursuant to Petitioner's specific request,[1] Randall W. Galford was appointed to be Petitioner's counsel during Petitioner's criminal trial and on appeal.

---

[1] *See* Motion in Form of Writ of Mandamus . . . and Motion to Dismiss Attorney, filed by Dann    on March 17, 2000, in Civil Action Number 00-F-17 [Doc. No. 26 in Case No. 00-F-17], seeking removal of Cynthia A. Stanton of the 28th Judicial Circuit Public Defender Corporation and appointment of Randell [sic] Galford.

CIVIL ORDER BOOK _195_ PAGE _595_

ENTERED _8-15-13_

-262-

3. Petitioner's criminal case (Case No. 00-F-17) proceeded to trial in August of 2000, on twenty-seven (27) counts, and the jury returned a verdict of guilty on the following counts: one (1) count of Sexual Assault in the First Degree; twelve (12) counts of Sexual Abuse in the First Degree; five (5) counts of Sexual Abuse by a Parent, Guardian, or Custodian; and nine (9) counts of Sexual Assault in the Second Degree.

4. On September 29, 2000, the Court imposed the following sentence:

a. not less than fifteen (15) nor more than twenty-five (25) years for Sexual Assault in the First Degree as contained in Count One;

b. not less than one (1) nor more than five (5) years for twelve (12) counts of Sexual Abuse in the First Degree as contained in Counts Two, Four, Five, Seven, Eight, Nine, Ten, Fifteen, Sixteen, Twenty-Two, Twenty-Three, and Twenty-Five, said sentences to run concurrently with each other and consecutive to the sentence for Sexual Assault in the First Degree;

c. not less than ten (10) nor more than twenty-five (25) years for the nine (9) counts of Sexual Assault in the Second Degree contained in Counts Eleven, Thirteen, Eighteen, Nineteen, Twenty, Twenty-Four, Twenty-Six, Twenty-Seven, and Thirty-Three, with the sentences for Counts Eleven and Thirteen to run consecutively to each other and consecutive to the sentence imposed on Counts One and Two and the sentences imposed on Counts Eighteen, Nineteen, Twenty, Twenty-Four, Twenty-Six, Twenty-Seven, and Thirty-Three Eleven and Thirteen;

d. not less than ten (10) nor more than twenty (20) years for Counts Twenty-One and Thirty-Four, Sexual Abuse by a Parent, Guardian, or Custodian, with the



CIVIL ORDER BOOK ___195___ PAGE __596__
ENTERED___8-15-13___

2

-263-

sentences to run consecutively with each other and the sentence imposed on Counts One, Two, Eleven, and Thirteen;

  e. not less than five (5) nor more than ten (10) years for Count Three, Sexual Abuse by a Parent, Guardian, or Custodian, with the sentence to run concurrently with the sentences imposed on Counts Twenty-One and Thirty-Four; and

  f. not less than five (5) nor more than fifteen (15) years for Counts Six and Fourteen, Sexual Assault by a Parent, Guardian, or Custodian, said sentence to run concurrently with each other and concurrent with the sentences imposed on Counts Twenty-One and Thirty-Four.

5. The Petitioner appealed this conviction and sentence to the Supreme Court of Appeals of West Virginia, which denied the Petitioner appellate review on November 7, 2001.

6. The Petitioner initiated this case on January 24, 2002, by filing a Writ of Mandamus, specifically seeking appointment of Randall W. Galford as habeas counsel. Mr. Galford previously served as Petitioner's counsel during Petitioner's criminal trial and on appeal.

7. Randall W. Galford was appointed as Petitioner's habeas counsel by order entered on March 14, 2002 [Doc. No. 4]. Thereafter, Petitioner filed various *pro se* motions, which listed Mr. Galford as counsel but were filed without Mr. Galford's knowledge or "understanding of the inert purpose or reasoning thereof."[2]

8. By order entered on July 26, 2002 [Doc. No. 32], Mr. Galford was relieved as counsel, and Gregory S. Hurley was appointed as Petitioner's new counsel.

---

[2] *See* Motion of Randall W. Galford for Leave to Withdraw as Counsel for Petitioner, Dann filed on July 8, 2002 [Doc. No. 26].

9.      Due to a conflict in representation,[3] Mr. Hurley was relieved as counsel, by order entered on September 18, 2002 [Doc. No. 46], and David M. Karickhoff was appointed as Petitioner's new counsel.

10.     Although the Petitioner had counsel, on November 1, 2002, Petitioner filed, *pro se*, the original Petition for Writ of Habeas Corpus [Doc. No. 54].

11.     Due to a break-down in communication between counsel and client,[4] David M. Karickhoff was relieved as counsel by order entered on June 27, 2003 [Doc. No. 68], and the Kanawha County Public Defender Corporation was appointed to represent the Petitioner.

12.     By order entered on February 2, 2004 [Doc. No. 75], this Court granted Petitioner's Motion for DNA Testing Records [Doc. No. 74]. Pursuant to that order, copies of the examination documents, worksheets and data generated by the West Virginia State Police Forensic Laboratory in Petitioner's criminal case (Case No. 00-F-17) were served on Petitioner's counsel, Gregory L. Ayers of the Kanawha County Public Defender Corporation, on or about March 9, 2004.[5]

13.     By letter dated December 28, 2005 [Doc. No. 78], this Court communicated with Petitioner's counsel to inquire about the status of Petitioner's amended petition. Thereafter, on January 11, 2006, the Court entered an Order Setting Briefing Schedule [Doc. No. 82].

---

[3] *See* Motion to Withdraw as Counsel, filed July 31, 2002 [Doc. No. 38]; Petitioner's Motion to Recuse Current Unqualified Counsel, and Appoint Long Termed [sic] 'Qualified Counsel', filed August 5, 2002 [Doc. No. 39]; and correspondence from Petitioner to Mr. Hurley, filed August 5, 2002 [Doc. No. 41].

[4] *See* Motion to Withdraw as Counsel, filed June 4, 2003 [Doc. No. 64]. *See also,* Petitioner's Motion for Disqualification of Counsel & Ineffective Assistance of Counsel: Appointment of Effective & Qualified Counsel, filed October 2, 2002 [Doc. No. 48], which was denied by order entered on October 9, 2002 [Doc. No. 53].

[5] *See* Certificate of Service [Doc. No. 76].

14. Pursuant to the Briefing Schedule, on April 10, 2006, Petitioner, by counsel, filed an Amended Petition for Writ of Habeas Corpus and a Memorandum in Support of Amended Petition for Writ of Habeas Corpus [Doc. Nos. 83-84] (together, referred to herein as the "Amended Petition"). The Amended Petition acknowledged that *Losh v McKenzie*, 166 W. Va. 762, 277 S.E.2d 606 (1981) requires all claims to be raised in this case, and therefore noted that Petitioner may also bring a *pro se* claim for ineffective assistance of counsel.

15. On May 15, 2006, the State filed a response [Doc. Nos. 92, 96], and on May 25, 2006, Petitioner, by counsel, filed a reply to the State's response [Doc. No. 98].

16. Having considered the parties' filings, on January 18, 2007, this Court entered its "Order Denying Writ of Habeas Corpus on All Grounds Except Ineffective Assistance of Counsel and Setting Evidentiary Hearing" [Doc. No. 102]. In that order, the Court denied all grounds for relief raised in the Petitioner's Amended Petition, with the exception of the claim of ineffective assistance of counsel. The Court then set an evidentiary hearing concerning the ineffective assistance of counsel claim for February 27, 2007, and the Court informed the Petitioner that he must file all grounds for relief to be heard on or by February 7, 2007.

17. Although the Petitioner had counsel, on February 8, 2007, Petitioner filed a Pro-Se Amended Petition for a Post-Conviction Writ of Habeas Corpus in Addendum to Appointed Counsels Amended Petition for Writ of Habeas Corpus [Doc. Nos. 105, 107] (referred to herein as the "Pro-Se Amended Petition"), arguing the claims previously denied by the Court's order entered on January 18, 2007; and raising the additional grounds of (a) ineffective assistance of counsel and (b) serology.

18. Evidentiary hearings were held on February 27, 2007, and April 20, 2007. *See*, Transcript of Evidentiary Hearing held on February 27, 2007 (referred to herein as "Feb. 27

Transcript") and Transcript of Evidentiary Hearing held on April 20, 2007 (referred to herein as "Apr. 20 Transcript"). At those hearings, the Kanawha County Public Defender's Office remained stand-by counsel, although the remaining issues were pursued by the Petitioner *pro se.* Following the evidentiary hearings, the Court set a briefing schedule, directing the Petitioner to file his brief by June 8, 2007. (Apr. 20 Transcript, pp. 196-197).

19. On May 14, 2007, the Petitioner filed a *pro se* "Motion for 'Stay of the Proceedings', Motion 'In Leave of Court' for Transcripts and Extension of Time Filing Pro Se, Summation, Brief" [Doc. No. 147], seeking a stay of the proceedings until the Petitioner could obtain a transcript from the evidentiary hearings on February 27, 2007, and April 20, 2007.

20. On June 13, 2007, this Court entered an "Order Granting Extra Time to Obtain Transcripts and Setting New Briefing Schedule" [Doc. No. 156]. In that order, the Court ordered that Petitioner's *pro se* brief addressing (a) ineffective assistance of counsel, and (b) serology evidence would be due thirty (30) days from the date the transcripts of the two hearings were mailed to him.

21. The transcripts of the evidentiary hearings were filed and mailed on or about July 30, 2008. Accordingly, the Petitioner had until on or about August 30, 2008, to file his brief.

22. The Petitioner did not file a brief, as directed by the Court.

23. On September 11, 2008, the Petitioner filed various *pro se* motions with this Court, related to the issues he is pursuing *pro se* [Doc. No. 158]. Those motions have been ruled upon by this Court in a separate order, of even date herewith.

CIVIL ORDER BOOK __195__ PAGE __600__
ENTERED __8-15-13__

6

-267-

24. After a status conference was scheduled, Petitioner filed two additional motions on March 19, 2013 [Doc. Nos. 166, 168]. Both of those motions are also ruled upon in a separate order, of even date herewith.

25. A Status Conference was held on March 26, 2013.

26. A third and final evidentiary hearing on the Petitioner's *pro se* claims was held on May 22, 2013. *See* Transcript of Evidentiary Hearing held on May 22, 2013 (referred to herein as "May 22 Transcript").

## II. Petitioner's Remaining Grounds for Habeas Corpus Relief

After entry of this Court's "Order Denying Writ of Habeas Corpus on All Grounds Except Ineffective Assistance of Counsel and Setting Evidentiary Hearing" on January 18, 2007, the only ground for relief remaining was Petitioner's *pro se* claim of ineffective assistance of counsel. However, prior to the two (2) evidentiary hearings that were held in February and April of 2007, the Petitioner also raised a ground for relief based on serology. *See*, Pro-Se Amended Petition. Therefore, at the evidentiary hearings on February 27, 2007, and April 20, 2007, the Court heard evidence on Petitioner's (a) ineffective assistance of counsel, and (b) serology claims.[6] Following the evidentiary hearings in 2007, this Court directed the Petitioner to brief his *pro se* claims. Petitioner never did brief these issues.

At the last hearing on May 22, 2013, Petitioner raised a third ground for habeas corpus relief, stating that he had never been informed about a *Kennedy* plea. In order to fully address

---

[6] In cases where West Virginia State Crime Laboratory serologist other than Fred Zain offered evidence against a prisoner, *Zain III* only requires an additional habeas corpus hearing on serology evidence where a prisoner was convicted between 1979 and 1999. Syl. Pt. 6, *Zain III*. In the present case, the Petitioner was indicted and convicted in 2000. However, Petitioner alleges that one of Fred Zain's assistants, Trooper Ted A. Smith, conducted DNA testing in this case in 1999. Therefore, this Court is treating the present case as one subject to *Zain III* in order to ensure that the Petitioner receives full consideration of all of his habeas corpus grounds for relief, including serology.

Petitioner's pending claim of ineffective assistance of counsel, this Court will also consider Petitioner's new claim about the plea offer.

Accordingly, three (3) grounds for habeas corpus relief remain before this Court, as all other grounds were denied by this Court's order entered on January 18, 2007. The Court finds that the Petitioner has had a full and fair opportunity to, with the assistance of counsel, raise all possible grounds for habeas corpus relief. Additionally, the Court finds that the Petitioner is and has been well aware that every potential ground for collateral attack which is conceivably applicable to Petitioner's case must be raised herein. *See* Amended Petition; May 22 Transcript, pp. 10-11 (Petitioner specifically referenced *Losh v. McKenzie*).

After carefully considering the documents submitted by the parties, along with all of the evidence and arguments presented in connection therewith, for the reasons explained below, the Court concludes that the Petitioner has failed to establish any basis for the requested post-conviction relief.

### III. Discussion

#### A. Ground I: Ineffective Assistance of Counsel[7]

In the Amended Petition, filed on April 10, 2006, Petitioner indicated, by counsel, that he may also raise a claim for ineffective assistance of counsel due to trial counsel's failure to present available witnesses to testify that the victim      had a reputation for not telling the truth. Thereafter, in the Petitioner's Pro-Se Amended Petition, filed on February 8, 2007, Petitioner again alleged that his trial counsel was ineffective pursuant to the two (2) prong test

---

[7] Petitioner's additional claim regarding counsel's failure to inform him of the *Kennedy* plea is discussed separately below.

set forth in *Strickland v. Washington*.[8] At the evidentiary hearings on February 27, 2007, and April 20, 2007, Petitioner presented testimony and other evidence regarding his claims of ineffective assistance of counsel.

In the State of West Virginia, claims of ineffective assistance of counsel are evaluated by the standards set forth in *State v. Miller*, 194 W. Va. 3, 459 S.E.2d 114 (1995). In *Miller*, the Supreme Court of Appeals of West Virginia adopted the two-prong test established by the United States Supreme Court's ruling in *Strickland v. Washington*, which held that a Petitioner most prove that:

> (1) Counsel's performance was deficient under an objective standard of reasonableness; and
>
> (2) there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceedings would have been different.

Syl. Pt. 5, *State v. Miller*, 194 W. Va. 3, 459 S.E.2d 114, *citing Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L.Ed.2d 674 (1984).

With respect to the first, performance-prong, the *Miller* Court offered the additional guidance that:

> [i]n reviewing counsel's performance, courts must apply an objective standard and determine whether, in light of all the circumstances, the identified acts or omissions were outside the broad range of professionally competent assistance while at the same time refraining from engaging in hindsight or second-guessing of trial counsel's strategic decisions. Thus, a reviewing court asks whether a reasonable lawyer would have acted, under the circumstances, as defense counsel acted in the case at issue.

Syl. Pt. 6, *Id.* Where, as in the present case, counsel's alleged ineffective assistance arises

---

[8] Petitioner's claim of ineffective assistance of counsel was raised *pro se*, with counsel remaining in a "stand-by" capacity, because Mr. Ayers and the Kanawha County Public Defender Corporation represented to the Court that they did not believe that they could ethically pursue those claims in the Amended Petition. *See* Feb. 27 Transcript, p. 5.

from trial "'strategy, tactics and arguable courses of action, his conduct will be deemed effectively assistive of his client's interests; unless no reasonably qualified defense attorney would have so acted in the defense of an accused.' Syl. Pt. 21, *State v. Thomas,* 157 W.Va. 640 (1974)." Syl. Pt. 3, *State v. Frye,* 221 W.Va. 154, 650 S.E.2d 574 (2006).

Quoting *Strickland,* the West Virginia Supreme Court noted that, in reviewing counsel's performance, a court should "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" *Id.* 194 W. Va. at 15, 459 S.E.2d at 126, *quoting Strickland,* 466 U.S. at 689, 104 S. Ct. at 2065, 90 L.Ed.2d at 694. That presumption was further explained in the *Miller* opinion, with the court stating that:

> . . . we always should presume strongly that counsel's performance was reasonable and adequate. A defendant seeking to rebut this strong presumption of effectiveness bears a difficult burden because constitutionally acceptable performance is not defined narrowly and encompasses a "wide range." The test of ineffectiveness has little or nothing to do with what the *best* lawyers would have done. Nor is the test even what most good lawyers would have done. We only ask whether a reasonable lawyer would have acted, under the circumstances, as defense counsel acted in the case at issue. We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at the time, in fact, worked adequately.

*Miller,* 194 W. Va. at 16, 459 S.E.2d at 127.

In the Amended Petition, Pro Se Amended Petition, and during the evidentiary hearings on February 27, 2007, and April 20, 2007, the Petitioner argued various reasons that he believes he was denied effective assistance of counsel. Those reasons and the related testimony are as follows:

1. Petitioner claimed that Randall Galford failed to call alibi witnesses. Specifically, the Petitioner claimed that Jim Burdette, Steve Swager and Patricia Swager could have provided testimony in the Petitioner's defense. (Feb. 27 Transcript, pp. 17-18, 24-25).

However, Mr. Galford testified that he was not aware that these people had additional alibi testimony or that, as a matter of strategy, their testimony would have helped the case. (Feb. 27 Transcript, pp. 21, 27, 32). For instance, Mr. Galford testified that the Petitioner's employers, such as Jim Burdette, could only provide an alibi for the Petitioner during work hours but did not provide an alibi for all evening or night. (Feb. 27 Transcript, pp. 15, 38). And when Jim Burdette testified at the hearing on February 27, 2007, his testimony did not establish a solid alibi for the Petitioner. (Feb. 27 Transcript, pp. 126-127). With respect to Steve Swager and Patricia Swager, Mr. Galford testified that he did not question them about any purported alibi because he was never told that Erika had been out of state in 1998. (Feb. 27 Transcript, p. 27).

Petitioner produced no evidence or testimony to show that Mr. Galford was aware that these witnesses could testify in Petitioner's favor or that a reasonable attorney would have called these witnesses to testify. Additionally, Mr. Galford testified that he reviewed the witness list with the Petitioner prior to the trial and that Petitioner did not object. (Feb. 27 Transcript, p. 22).

2. Petitioner claimed that Mr. Galford should have asked Dr. Stanley, who \
doctor in 1991, whether he noticed any trauma to the girl's vagina. (Feb. 27 Transcript, pp. 7, 10). Mr. Galford testified that he did not call Dr. Stanley as a witness because Dr. Stanley did not perform a full examination    nd that he did not believe the doctor's testimony would have been helpful to the Petitioner's case. (Feb. 27 Transcript, pp. 10-13). Mr. Galford further testified that he believed Dr. Stanley's testimony could have been hurtful to the Petitioner's case because it might have caused jurors to question why a child was suffering from a urinary tract

CIVIL ORDER BOOK __195__ PAGE __605__
ENTERED __8-15-13__

-272-

infection and vaginal infections. (Feb. 27 Transcript, p. 95).

As indicated by Mr. Galford, Dr. Stanley did testify at the hearing on February 27, 2007, that he never performed a vaginal exam on        but that he did treat her for urinary tract infection and vaginitis. (Feb. 27 Transcript, pp. 107-110). Accordingly, Mr. Galford's decision to not call Dr. Stanley was a strategic decision, and Petitioner failed to demonstrate that a reasonable attorney in Mr. Galford's position would have called Dr. Stanley to testify.

3. Petitioner claimed that Mr. Galford did not adequately develop the theory that the victim        was not a truthful person. The Petitioner claimed that Dr. O'Keefe, who had performed a psychological evaluation of        should have more thoroughly question        regarding her deceitful disposition. (Feb. 27 Transcript, pp. 55-56). When the Petitioner examined Dr. O'Keefe at the evidentiary hearing on April 20, 2007, Dr. O'Keefe did testify that if he had had evidence of        lying and evidence that        had motive to lie, that information "might" have changed his conclusions. (Apr. 20 Transcript, p. 77). However, Dr. O'Keefe also testified that his own independent observations of a child were generally more reliable than information provided to him by parents or stepparents of a child. (Apr. 20 Transcript, p. 85). With respect to the victim in this case        , he indicated that he believed the truth of her statements because she did not agree with his suggestions, had great difficulty telling what happened, and was very emotionally involved. (Apr. 20 Transcript, p. 85-87).

At the hearing on February 27, 2007, Mr. Galford testified that the testimony of Dr. O'Keefe was helpful to the case and that he could not have handled the direct

12

examination of the witness any better. (Feb. 27 Transcript, p. 56-58, 96). Specifically, Mr. Galford testified that he made a strategic decision to not tear down Dr. O'Keefe's helpful opinions by attacking other aspects of his examination of (Feb. Trnascript, p. 56-58). Petitioner produced no evidence to demonstrate that a reasonable attorney would have questioned Dr. O'Keefe any differently or better than Mr. Galford.

4. Petitioner claimed that Mr. Galford should have called Dusty McClung to the witness stand and that he would have testified that        lied about being raped. (Feb. 27 Transcript, p. 74). However, when Dusty McClung testified on February 27, 2007, he stated that he had never hea      say anything and that the first he had heard about lying was a rumor he heard through an investigator, Debbie Cmiel, (Feb. 27 Transcript, pp. 140-144), who was investigating Petitioner's habeas corpus case for Kanawha County Public Defender Corporation. At the evidentiary hearing on April 20, 2007, the Petitioner questioned Matthew Moul, who contradicted Dusty McClung's statement, indicating that they had been at a party in 1999 or 2000 where        was complaining that she was tired of the Petitioner telling her what to do and that she would "fix" her stepfather for grounding her. (Apr. 20 Transcript, pp. 170-173). Nevertheless, Petitioner failed to show that Dusty McClung would have testified at trial as Petitioner suggested.

Additionally, Mr. Galford testified that the investigator he hired spent a lot of time and money interviewing the kids in the community and had heard only one rumor that the victim had lied. (Feb. 27 Transcript, pp. 74-75).

CIVIL ORDER BOOK _195_ PAGE _607_
ENTERED _8-15-13_

-274-

5. Petitioner claimed that Mr. Galford allowed 404(b) evidence to be submitted to the jury when three (3) handwritten statements of the victim were submitted into evidence which contained collateral information outside the charges in the indictment. (Feb. 27 Transcript, p. 66-69). Specifically, the victim's handwritten statements contained an allegation that the Petitioner stabbed the victim's mother with a knife and allegations related to charges involving that had been dismissed. The allegations in the letters were not testified to at trial, but the Petitioner claimed that the allegations were prejudicial. Mr. Galford did not state a position on this claim and testified that he did not remember if the jury deliberated on this evidence. (Apr. 20 Transcript, p. 69). Petitioner produced no evidence to show that a reasonable attorney in Mr. Galford's position would have objected to this evidence, how a court would have ruled on any such objection, or whether suppression of this evidence would have resulted in a different verdict.

6. Petitioner claimed that Mr. Galford failed to have a psychological examination performed on him prior to trial. (Apr. 20 Transcript, p. 71). Mr. Galford stated that he hired Dr. Joseph Whelan from Beckley to perform the evaluation and, based on the doctor's great reputation, that he believed the doctor did perform a careful psychological examination. (Feb. 27 Transcript, p. 71). The Petitioner testified that Dr. Whelan did not perform a psychological evaluation on him. (Feb. 27 Transcript, p. 70). However, the file in the underlying criminal case, Civil Action Number 00-F-17, contains a letter from Dr. Joseph Whelan to Randall Galford, dated July 31, 2000 [Doc. No. 234 in Case. No. 00-F-17], stating:

> I evaluated Mr. on June 10, 2000 at the
> Central Regional Jail, Summersville, West Virginia. It

> is my opinion that Mr.        was at the time of 1991
> through the present, M        [sic] was mentally
> competent for his actions.
>
> It is my opinion with reasonable medical certainty that
> l        is able to stand trial and to assist in his own
> defense.

Petitioner did not produce any testimony or evidence to show that the contents of Dr. Whelan's letter to Mr. Galford were inaccurate. At the time of the hearings in 2007, Dr. Whelan was deceased and unavailable to testify.

7. The Petitioner claimed that Mr. Galford failed to bring in an independent expert witness who would have testified that the DNA evidence was falsified. (Feb. 27 Transcript, p. 40). Mr. Galford testified that he did originally think that the test results were falsified. However, when he sent samples to an independent laboratory, Lyle Laboratories, for testing, their results were consistent with the findings of the State Police Crime Laboratory. (Feb. 27 Transcript, p. 40-44). Mr. Galford also testified that he did not bring in an independent expert witness to testify that the samples could have been contaminated because they had no "theory of contamination" to present to the jury. (Feb. 27 Transcript, p. 46). Mr. Galford further testified that he was unaware that an expert of Lyle Laboratories was willing to testify that the samples could have been contaminated. (Feb. 27 Transcript, p. 46). The letter from Lyle Laboratories submitted by Petitioner (Exhibit 2 from hearing on Feb. 27 [Doc. No. 33]) does not establish that Mr. Galford was aware that Lyle Laboratories could have testified in the Petitioner's favor or that testimony would have been helpful to the Petitioner's case. Although the letter states that contamination of evidence "is always possible", it states clearly that Lyle Laboratories would have no way of determining whether the

evidence was contaminated or whether contamination was accidental or intentional.

On April 20, 2007, the Petitioner testified that Lyle Laboratories did not appear in his criminal trial because Mr. Galford did not pay them for testing the DNA samples. (Apr. 20 Transcript, p. 186). To the contrary, Mr. Galford testified that he did pay Lyle Laboratories in full (Feb. 27 Transcript, pp. 53-54). Petitioner further claimed that the experts at Lyle Laboratories could cast doubt upon the DNA evidence in his case but would not appear now in his habeas corpus case because Mr. Galford treated them "deceitfully." (Apr. 20 Transcript, p. 190). However, Petitioner provided no evidence of any such "deceitful" treatment.

8. Petitioner claimed that Mr. Galford was frequently intoxicated during the criminal trial (Apr. 20 Transcript, pp. 188-89), but Petitioner produced no testimony or evidence in support of this claim.

Having carefully reviewed each of the Petitioner's claims of ineffective assistance of counsel and the evidence presented during the evidentiary hearings, the Court concludes that the Petitioner failed to prove that Mr. Galford's assistance was deficient or ineffective under the standard set forth in *Miller*. The majority of the Petitioner's claims relate to Mr. Galford's trial strategy, and this Court finds that "a reasonable lawyer would have acted, under the circumstances, as [Mr. Galford] acted in the case at issue." Syl. Pt. 6, *Miller*, 194 W. Va. 3, 459 S.E.2d 114. Moreover, Mr. Galford testified that he discussed all strategies with the Petitioner and that the Petitioner agreed to the trial strategies they pursued. (Feb. 27 Transcript, p. 102). Further, the Petitioner failed to show that Mr. Galford did not make a reasonable investigation of the case so as to properly make informed professional decisions.



To the contrary, Mr. Galford spent a considerable amount of time and money investigating and trying the Petitioner's criminal case. (Feb. 27 Transcript, p. 75, 84-88).

Significantly, even if, *arguendo*, the Petitioner's counsel had provided ineffective, incompetent assistance, the Petitioner's claim for relief on this basis would nevertheless fail, because the Petitioner suffered no prejudice as a result of any alleged conduct on the part of his counsel. Specifically, after consideration of the first, performance-prong, if it is determined that defense counsel acted incompetently, then it is necessary to address the second prong of the *Miller/Strickland* test: to determine whether such incompetence resulted in any prejudice to the defendant. *See*, Syl. Pt. 5, *State v. Miller*, 194 W. Va. 3, 459 S.E.2d 114 (1995). "To demonstrate prejudice, a defendant must prove there is a 'reasonable probability' that, absent the errors, the jury would have reached a different result." *Id.* 194 W. Va. at 15, 459 S.E.2d at 126, *citing Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068, 80 L.Ed.2d at 698. The Petitioner has failed to meet this burden by failing to produce any evidence to show that, but for counsel's errors, the results of the proceedings would have been different.[9] Syl. Pt. 5, in part, *Miller*. Absent any prejudice to the Petitioner as a result of some conduct or omission on the part of his counsel, the Petitioner cannot prevail on his claim for post-conviction relief on the basis of ineffective assistance of counsel.

After reviewing all pertinent evidence and arguments, this Court now concludes, as a matter of law, that the conduct of the Petitioner's defense counsel was well within the range

---

[9] The Court notes that, at the hearing on May 22, 2013, the Petitioner indicated that he wanted to call additional witnesses on this issue, but that Mr. Ayers failed to subpoena them. (May 22 Transcript, p. 7, lines 9-16). In response, Mr. Ayers stated that the Petitioner had not given him the names of any witnesses that he wanted subpoenaed, or he would have subpoenaed them as he had for the two prior evidentiary hearings. (May 22 Transcript, p. 9, lines 12-14).

When asked who the additional witnesses would be, Petitioner indicated that he wanted to call jurors, to which the Court responded that Petitioner would not be permitted to call jurors to impeach a jury verdict. (May 22 Transcript, p. 31-33). The Court will not permit Petitioner to subpoena jurors to question them about what they would have done if his lawyer had submitted different evidence or presented evidence differently, particularly where such purported evidence is only speculative.

of strategic decisions that a reasonable, competent criminal lawyer would have made under all the circumstances of the case. Moreover, even if, *arguendo*, there were errors or mere unsuccessful strategic decisions made by the Petitioner's counsel, such errors were harmless and did not cause any prejudice to the Petitioner, as there was no reasonable probability that the proceeding would have ended differently if not for such alleged errors or tactical decisions. Accordingly, the Court finds that the Petitioner has failed to meet his burden of proving that he is entitled to habeas corpus relief on the basis of his claims of ineffective assistance of counsel.

## B. Ground II: Serology

In the Petitioner's Pro-Se Amended Petition, filed on February 8, 2007, Petitioner raised the additional ground for relief based on serology evidence, and the Petitioner had the opportunity to present evidence on his serology claims at the evidentiary hearings on February 27, 2007, and April 20, 2007. The Court finds that the Petitioner knowingly and intelligently waived his right to representation by counsel on the serology claims.[10] With respect to the Petitioner's claim regarding unreliable serology evidence, the Court has considered all of the evidence and arguments presented. As a result, the Court concludes that the Petitioner has failed to prove that he is entitled to relief on this basis. The reasons for the

---

[10] The following exchange took place at the hearing on February 27, 2007:
THE COURT: Well, let me - - I was going to ask him. Do you wish to proceed pro se, then, on the serology issue, also? Is that right,
: Yes, sir.
THE COURT: Mr. Ayers will be your back-up counsel?
Yes, sir.
THE COURT: All right.
Feb. 27 Transcript, p. 150, lines 19-24, p. 151, lines 1-2. At the beginning of the hearing on April 20, 2007, the Court again noted that the Petitioner was proceeding *pro se* but that Mr. Ayers was stand-by counsel. Apr. 20 Transcript, p. 4. In his capacity as stand-by counsel, Mr. Ayers subpoenaed the witnesses requested by Petitioner. *See also,* May 22 Transcript, p. 8.

Court's conclusion, as well as the factual findings and legal authority upon which the conclusion is based, are as follows:

In *In re Renewed Investigation of State Police Crime Laboratory, Serology*, 219 W. Va. 408, 633 S.E.2d 762 (2006) ("*Zain III*"), the West Virginia Supreme Court of Appeals held that:

> . . . . a prisoner against whom a West Virginia State Police Crime Laboratory serologist, other than Fred Zain, offered evidence and who challenges his conviction based on the serology evidence is to be granted a full habeas corpus hearing on the issue of serology evidence.

Syl. Pt. 4, *Zain III*. Further, "a prisoner who was convicted between 1979 and 1999 and against whom a West Virginia State Police Crime Laboratory serologist, other than Fred Zain, offered evidence may bring a petition for a writ of habeas corpus based on the serology evidence despite the fact that the prisoner brought a prior habeas corpus challenge to the same serology evidence, and the challenge was finally adjudicated." *Id.* at Syl. Pt. 6. Pursuant to these provisions, the Petitioner was granted a full habeas corpus hearing on the issue of the serology on February 27, 2007, and April 20, 2007.[11]

In order to assess the merits of the Petitioner's allegations with respect to the serology evidence, it is first necessary to identify the standards applicable to such claims. To prevail in post-conviction habeas corpus proceedings, the "petitioner has the burden of proving by a preponderance of the evidence the allegations contained in his petition or affidavit which would warrant his release." Syl. Pt. 1, *Scott v. Boles*, 150 W. Va. 453 (1966). Specifically, in cases where a prisoner challenges his or her conviction based on serology evidence pursuant to *Zain III*, the petitioner "must [first] prove that the serologist offered false evidence in his or her prosecution." *Zain III*, 219 W. Va. at 415, 633 S.E.2d at 769. The West Virginia

---

[11] *See,* fn. 6, *supra.*

Supreme Court of Appeals made it clear in *State ex rel. Burdette v. Zakaib*, 224 W. Va. 325, 332, 685 S.E.2d 903, 910 (2009) that "[a] defendant simply cannot make unsupported and blanket allegations and expect a circuit court to grant him a new trial." The Petitioner bears the burden of proving the falsity of the serology evidence. *See, Id.; Zain III.*

Once the Petitioner demonstrates that the evidence presented at trial was false, the Petitioner must then demonstrate the necessity for a new trial by proving the following five (5) factors set out in *State v. Frazier*, 162 W. Va. 935, 253 S.E.2d 534 (1979):

> (1) The evidence must appear to have been discovered since the trial, and, from the affidavit of the new witness, what such evidence will be, or its absence satisfactorily explained.
> (2) It must appear from facts stated in his affidavit that [defendant] was diligent in ascertaining and securing his evidence, and that the new evidence is such that due diligence would not have secured it before the verdict.
> (3) Such evidence must be new and material, and not merely cumulative; and cumulative evidence is additional evidence of the same kind to the same point.
> (4) The evidence must be such as ought to produce an opposite result at a second trial on the merits.
> (5) And the new trial will generally be refused when the sole object of the new evidence is to discredit or impeach a witness on the opposite side. Syllabus Point 1, *Halstead v. Horton*, 38 W.Va. 727, 18 S.E. 953 (1894).

*Zain III*, 219 W. Va. at 415, 633 S.E.2d at 769, *quoting* Syllabus, *State v. Frazier*, 162 W. Va. 935, 253 S.E.2d 534 (1979).

### i.     Serology Evidence Presented At Trial

In the present case, the Petitioner's first burden was to prove that the serologists offered false evidence in the Petitioner's prosecution. *See, Zain III*, 219 W. Va. at 415, 633 S.E.2d at 769. The Court finds that the Petitioner failed to meet this burden of proof. The Petitioner only made "unsupported and blanket allegations" based on speculation and

conjecture.[12] *See, Zakaib*, 224 W. Va. at 332, 685 S.E.2d at 910. Having reviewed all evidence presented during the underlying criminal trial and during the evidentiary hearings in this case, the Court finds that the testimony and evidence produced by Petitioner in this habeas corpus proceeding supports the validity of the serology evidence offered during the criminal trial.

At the evidentiary hearing on February 27, 2007, Petitioner questioned Randall Galford regarding the independent laboratory testing performed by Lyle Laboratories during the pendency of Petitioner's criminal case. When asked why he didn't call an expert from Lyle Laboratories to testify at the criminal trial, Mr. Galford responded that Lyle Laboratories reached the same conclusion as did the State Police Lab, so he did not believe it was necessary to call them as an expert to say the same thing as the State Police Lab. (Feb. 27 Transcript, pp. 41-41, 46-47).[13] Similarly, at the more recent hearing on May 22, 2013, in response to allegations made against Mr. Ayers by the Petitioner, Mr. Ayers represented to the Court that his office "did substantial investigation on DNA evidence" (May 22 Transcript, p. 17) but did not raise any DNA issues in the Amended Petition due to the results of that investigation. (May 22 Transcript, p. 18).[14] It was for that reason that the Petitioner proceeded on the DNA issue *pro se*. (May 22 Transcript, p. 18).

---

[12] For instance, during the evidentiary hearing on February 27, 2007, the Petitioner argued that:
> . . . well, there's things that doesn't add up in this to them. And, specifically, the flat blood stain, flat sheet stain, that they've got a lot of explaining to do on. And I've researched this and been researching on this, and they've got a lot of questions to be answered because some testimony they gave does not fit, and it's very suspicious.

Feb. 27 Transcript, p. 146; *see also* Pro-Se Amended Petition, "Sixth Claim", p. 11.

[13] Although not discussed above, this Court finds that Mr. Galford's effective assistance as trial counsel is further evidenced by his strategic decision to not call an expert from Lyle Laboratories at the criminal trial due to the fact that Lyle Laboratories would have only corroborated the State Police Lab's findings.

[14] Mr. Ayers elaborated, stating that "we did raise every issue [in the Amended Petition] that we believed we could ethically raise. We are bound by the rules of ethics, and we can't raise frivolous claims . . ." (May 22 Transcript, p. 20).

During the evidentiary hearing on April 20, 2007, the Petitioner called three (3) forensic scientists who worked or formerly worked for the West Virginia State Police Crime Laboratory and who had all testified in Petitioner's criminal trial. Each of their testimonies in this case was consistent with their respective testimony at Petitioner's criminal trial. Further, the majority of the irregularities in their testimony cited by Petitioner are identical to the same inconsistencies which Randall Galford identified during trial testimony.[15] The testimony of those three (3) individuals was as follows:

**Darren Francis:** Darren Francis' testimony at trial was brief. (Trial Transcript from Criminal Case No. 00-F-17 (hereinafter referred to as "Trial Transcript"), Vol. III, pp. 7-12). He identified the items on which he performed presumptive testing. He also testified that he found blood but no semen on the blanket and neither blood nor semen on the pair of panties he received. (Trial Transcript, Vol. III, pp. 11). Nothing in his testimony at the evidentiary hearing was inconsistent with what he testified to at trial.

At the evidentiary hearing on April 20, 2007, Mr. Francis testified that he verified the DNA tests in the Petitioner's case, indicated by his initials "DRF" on the page. (Apr. 20 Transcript, pp. 11-12; Petitioner's Exhibit 5). He further testified that the tests were performed by Ted Smith, and he explained notations on Petitioner's Exhibit 5 (Apr. 20 Transcript, pp. 11-12). Mr. Francis testified that every test performed at the State Police Crime Laboratory was witnessed by another analyst (Apr. 20 Transcript, pp. 16, 23), and that to the best of his knowledge, the standards of quality assurance and proficiency were followed in the Petitioner's case. (Apr. 20 Transcript, p. 29). He stated that it was not uncommon for a presumptive test and a confirmatory test to yield different results. He testified that a

---

[15] Although not discussed above, this fact further supports the Court's finding that Mr. Galford was effective trial counsel.

confirmatory test may be able to detect sperm cells on a sample, depending on environmental deterioration, where a presumptive test had been negative for acid phosphatase ("AP"). (Apr. 20 Transcript, pp. 29-30). Finally, he testified that the State Police Crime Laboratories separated the DNA samples in order to prevent contamination. (Apr. 20 Transcript, p. 30-31).

**Tina Moroose:** During the trial, Mr. Galford identified and objected to the disparity between Tina Moroose's preliminary and trial testimony. (Trial Transcript, Vol. II, pp. 48-51). Specifically, at trial, Ms. Moroose testified that she received a weak AP color change during the presumptive test of the flat sheet but still indicated that the flat sheet was negative for semen because the AP was so weak. (Trial Transcript, Vol. II, p. 52). She also testified that, even though her preliminary test indicated that there was no semen on the sample, it was not unusual for another analyst, performing a more in-depth examination, to find semen on the sample. (Trial Transcript, Vol. II, pp. 52, 61).

At the evidentiary hearing on April 20, 2007, Ms. Moroose testified that she received evidence in the Petitioner's case, and that she had performed presumptive AP test on the items she received. (Apr. 20 Transcript, pp. 35-36). She testified that in her initial report she indicated that the flat sheet was negative for AP, indicating that there was no semen on the flat sheet. (Apr. 20 Transcript, p. 36). She explained that at trial she had said there was a weak AP color change but it was too slight to declare it a positive, so she said it was negative. (Apr. 20 Transcript, pp. 36-37, 56). She testified that although her worksheet was not initialed as witnessed by another analyst, that "we did not work alone" and that "I don't know why it's not witnessed and dated that time." (Apr. 20 Transcript, pp. 39, 44). She further testified that it was not possible that her worksheet had been altered. (Apr. 20 Transcript, p.

44). She testified that she gave the DNA sample to Ted Smith for testing on December 27, 1999. (Apr. 20 Transcript, p. 53). During cross-examination, she testified that the State Police Crime Laboratory was audited every other year by an outside agency, that protocols and efficiency testing were used during presumptive testing, and that at the time the testing was performed in Petitioner's case, the State Police Crime Laboratory was accredited. (Apr. 20 Transcript, p. 54).

**Ted Smith:** During the Petitioner's criminal trial, Trooper Smith testified to his methods of extracting and identifying DNA from forensic samples. He testified to the method he used to separate the male and female cells in the mixture stain in the Petitioner's case. (Trial Transcript, Vol. II, pp. 90-91). He further testified that the male components of the mixture were consistent with the Petitioner's DNA, and the female components of the mixture were consistent wi          's DNA. (Trial Transcript, Vol. II, p. 92). Mr. Galford questioned Trooper Smith concerning the disparity between Ms. Moroose's negative report for AP and his identification of semen on the flat sheet. (Trial Transcript, Vol. II, p. 117). Trooper Smith agreed that a possible explanation for the disparity was that the semen had degraded over time. (Trial Transcript, Vol. II, p. 118). He never testified that the DNA from the Petitioner and the DNA from the victim were deposited at the same time. (Trial Transcript, Vol. II, p. 125). Mr. Galford also questioned Trooper Smith regarding the transfer of DNA between samples, and Smith agreed that DNA could be transferred. (Trial Transcript, Vol. II, p. 127). Trooper Smith never testified that it was impossible for a transfer to occur once the sample had dried. He testified that small amounts of DNA might be transferred between dry samples but that the test used at the Crime Laboratory would not usually detect such small amounts. (Trial Transcript, Vol. II, p. 132).

At the evidentiary hearing on April 20, 2007, Ted Smith testified that he had performed the DNA testing on the evidence in the Petitioner's criminal trial, testing two blanket samples and a flat sheet sample. (Apr. 20 Transcript, p. 91). He also testified that Darren Francis witnessed the testing, and explained the notations on Petitioner's Exhibit 5. (Apr. 20 Transcript, p. 92-94). Mr. Smith testified that, based on his report, he could not exclude the Petitioner as a donor of the DNA and sperm on the flat sheet sample. (Apr. 20 Transcript, p. 117). He further testified that, although one possible explanation of the DNA mixture on the flat sheet was that it did not result from sexual intercourse, he could not say exactly how the DNA mixture was deposited. (Apr. 20 Transcript, p. 120). He also testified that sexual intercourse was another explanation for how the DNAs were mixed. (Apr. 20 Transcript, p. 146). Mr. Smith denied that the Supreme Court of Appeals had ever determined that he had given false testimony. (Apr. 20 Transcript, p. 141). He further testified that the Crime Laboratory's protocol allowed analysts to take a picture or draw a diagram of the evidence. (Apr. 20 Transcript, pp. 143-144). He testified that the samples were not accidentally or purposefully contaminated during testing. (Apr. 20 Transcript, p. 163).

The only evidence produced by the Petitioner with respect to his claim for relief based on serology evidence were the testimonies of the three (3) forensic scientists, the related Exhibits and Petitioner's own testimony. Having carefully reviewed the serology evidence presented at the time of Petitioner's trial and the evidence proffered in this case, the Court concludes that the Petitioner has failed to prove that the serologist(s) offered false evidence in his trial. *See, Zain III*, 219 W. Va. at 415. The Petitioner here relies only on speculation or conjecture, but has failed to prove that the evidence was false and not merely unreliable. The

Petitioner pointed out several irregularities in the Crime Laboratory's paperwork (such as the absence of a witness on Ms. Moroose's worksheet), but the Petitioner has not proven that these irregularities are anything more than the occasional, "relatively minor" errors which "did not significantly compromise[ ] the prosecution[ ] . . . in which these . . . serologists were involved." *See, In re W. Va. State Police Crime Lab., Serology Div. (Zain II)*, 191 W. Va. 224, 226, 445 S.E.2d 165, 167 (1994). Accordingly, the Petitioner has produced no testimony or evidence to prove that the serology evidence offered during his criminal trial was false.

### ii.    Necessity of a New Trial - Consideration of the *Frazier* Factors

Even if the Petitioner had been able to prove that the serology evidence presented at his trial was false, he failed to meet the burden of proving the second requirement of *Zain III*: that he demonstrate the necessity for a new trial. Specifically, Petitioner is unable to prove the five (5) factors set out in *State v. Frazier*, 162 W. Va. 935, 253 S.E.2d 534 (1979).

First, the Petitioner has not demonstrated that he has acquired new evidence.[16] Accordingly, the Petitioner is unable to show that due diligence could have secured any such new evidence before the verdict.[17] Similarly, the Petitioner is unable to prove that any new evidence is material.[18] Instead, the evidence presented and argued by the Petitioner in this

---

[16] The first of the five (5) factors set forth in *Frazier* requires that: "[t]he evidence must appear to have been discovered since the trial, and, from the affidavit of the new witness, what such evidence will be, or its absence satisfactorily explained." Syl. Pt. 3, *Zain III, quoting* Syllabus, *Frazier*, 162 W. Va. 935, 253 S.E.2d 534.

[17] The second *Frazier* factor requires that: "[i]t must appear from facts stated in his affidavit that [defendant] was diligent in ascertaining and securing his evidence, and that the new evidence is such that due diligence would not have secured it before the verdict." *Id.*

[18] The Petitioner must also prove that the new "evidence must be new and material, and not merely cumulative; and cumulative evidence is additional evidence of the same kind to the same point." *Id.*

CIVIL ORDER BOOK *195* PAGE *620*

ENTERED *8-15-13*

-287-

proceeding has been a cumulative repetition of his trial counsel's objections to the DNA evidence.

As Petitioner has not produced new evidence, Petitioner is unable to show that any such evidence would produce an opposite result at a second trial.[19] Moreover, even if the new evidence had been material or had contradicted the prior serology evidence, it would still not produce an opposite result at a second trial. After reviewing the transcript of the trial and the testimony presented therein, the Court finds that the serology evidence was not determinative at the trial. Finally, any of the minor irregularities that the Petitioner has identified could be used only to impeach the State's forensic witnesses as prior inconsistent statements; and as such, would not serve as a basis for a new trial.[20]

For all of the foregoing reasons, the Court finds that Petitioner's writ of habeas corpus on the grounds of serology evidence should be denied. The Petitioner has received a review of the evidence, and the Court reviewed the evidence that Petitioner presented with painstaking scrutiny. *See,* Syl. Pt. 4, *Zain III.* However, the Petitioner has failed to meet his burden of proving (a) that the serologist offered false evidence in his prosecution, and (b) the necessity for a new trial. *See, Zain III.*

## C. Ground III: Plea Agreement

At the hearing on May 22, 2013, the Petitioner raised a new issue, alleging that no one told him about the *Kennedy* plea and that he did not understand that there was a *Kennedy* plea,

---

[19] In addition to showing that the new evidence is material, the Petitioner is also required to prove that "[t]he evidence must be such as ought to produce an opposite result at a second trial on the merits." *Id.*

[20] The Court in *Frazier* stated that a "new trial will generally be refused when the sole object of the new evidence is to discredit or impeach a witness on the opposite side." *Id., quoting* Syl. Pt. 1, *Halstead v. Horton,* 38 W.Va. 727, 18 S.E. 953 (1894).

-288-

where he did not have to admit guilt. *See,* May 22 Transcript, pp. 22, 55. Based on *Missouri v. Frye,* 132 S.Ct. 1399, 182 L.Ed.2d 379 (2012) and *Lafler v. Cooper,* 132 S. Ct. 1376, 182 L.Ed.2d 398 (2012), this Court considers Petitioner's third ground for relief as a claim for ineffective assistance of counsel, under the two-part test of *Strickland,* set forth and discussed above. *See also, Hill v. Lockhart,* 474 U.S. 52, 106 S. Ct. 366, 88 L.Ed.2d 203 (1985).

Therefore, the first inquiry is whether "counsel's performance was deficient under an objective standard of reasonableness". Syl. Pt. 5, in part, *State v. Miller,* 194 W. Va. 3, 459 S.E.2d 114, *citing Strickland v. Washington,* 466 U.S. 668, 104 S. Ct. 2052, 80 L.Ed.2d 674 (1984). Recent opinions of the United States Supreme Court have held that effective counsel must communicate plea offers to their clients and be especially cautious in advising a client to reject an offer. In *Frye* the Supreme Court held that, "as a general rule, defense counsel has a duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused." *Frye,* 132 S. Ct. at 1408. In *Lafler,* decided on the same day as *Frye,* all parties agreed that counsel's performance was deficient where counsel advised his client to reject the plea offer on the grounds that he could not be convicted at trial. When the defendant proceeded to trial, based on his counsel's advice, he received a sentence harsher than that offered in the rejected plea bargain. *Lafler,* 132 S. Ct. at 1383.

If it is determined, under the first prong of the *Strickland* test, that defense counsel acted incompetently, a defendant must then establish prejudice by showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceedings would have been different." Syl. Pt. 5, in part, *State v. Miller,* 194 W. Va. 3, 459 S.E.2d 114. "In the context of pleas a defendant must show the outcome of the plea process would have been different with competent advice." *Lafler,* 132 S. Ct. at 1384, *citing Frye,*

CIVIL ORDER BOOK ___195___ PAGE _622_

ENTERED___8-15-13___

-289-

132 S. Ct. at 1399. More specifically, in cases were a plea offer was rejected,

> . . . a defendant must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (i.e., that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under judgment and sentence that in fact were imposed.

*Lafler*, 132 S. Ct. at 1385.

In the present case, the Petitioner states that neither his counsel nor anyone else ever told him about the *Kennedy* plea.[21] The Petitioner also tendered a purported[22] letter from his counsel, Randall Galford, and indicated that he had additional evidence which he would submit to the Court following the hearing. The Court never received any such evidence.

---

[21] Transcript of Hearing on May 22, 2013, p. 22, lines 9-11:
THE COURT: What issue is that?
: That's on the <u>Kennedy</u> plea bargain where Randall never -
- noboay told be about the <u>Kennedy</u> plea bargain.

Transcript of Hearing on May 22, 2013, p. 55, lines 2-17.
Your Honor, I would really like to have a - - a hearing on this, an evidentiary hearing on this plea bargain deal. If I would have known - - had I known I would not have had to admit guilty on the - - on a <u>Kennedy</u> plea - -
THE COURT: Did I not explain that to you? I usually - -
No. It's not - -
THE COURT: - - explain it to you.
Nobody told me that.
THE COURT: Okay.
I've never knew it was - -
THE COURT: Okay. I'll go back and look at the transcript and see - -
No. It's in the trans - - They're clear. No, nobody explained to me what a <u>Kennedy</u> plea was.. . .

[22] This Court uses the phrase "purported" because the Court is uncertain of the origin of the letter presented by the Petitioner. For instance, in the letter allegedly sent from Mr. Galford, the word "except" is incorrectly used in place of the word "accept." Additionally, the letter also includes repeated misuse of an apostrophe. Randall Galford was an educated, competent attorney who practiced regularly before this Court and was not known to this Court to make these types of grammatical errors.
Interestingly, the Court notes that the Petitioner commonly confuses the words "accept" and "except" and also misuses apostrophes (*see, e.g.*, Petitioner's "Pro Se Motion in Leave of Court to 'Reconstruct the 'Record' West Virginia <u>Rule's</u> [sic] of Civil Procedures [sic], Rule 80(e)" [Doc. No. 166]).

Having reviewed the transcripts of the pre-trial hearings in Petitioner's underlying criminal case (Case No. 00-F-17), the Court finds that Petitioner's counsel, Randall Galford, did communicate to the Petitioner formal plea offers on terms and conditions that would have been favorable to the Petitioner (*see also*, Feb. 27 Transcript, p. 22, lines 10-12); and the Petitioner confirmed to the Court that he had considered and rejected such offers. For instance, at a pre-trial hearing on July 21, 2000, the following exchange took place:

THE COURT: . . . Have offers been communicated?

MR. ANDERSON [P.A.]: Yes. There's been offers, and an offer expired the other day or sometime in the past.

THE COURT: What was the last offer?

MR. GALFORD: Twenty-five years.

MR. ANDERSON: Yeah, that's about the sentence we would have - - somewhere in that area. I'd have to look at the plea offer.

THE COURT: I just want to make sure that those offers have been conveyed to you and that you've had a chance to discuss those with your attorney, and that you have decided that you don't want to take those offers. Is that correct?

THE DEFENDANT: Correct.

THE COURT: Okay. I just wanted to make sure.

MR. GALFORD: Thank you.

THE COURT: On August 1st, I want a list of what has been offered so we can go over it.

MR. ANDERSON: Okay, Your Honor, I certainly would.

THE COURT: I don't want anybody saying that they weren't communicated at some point in time.

CIVIL ORDER BOOK 195 PAGE 624
ENTERED 8-15-13

30

-291-

Transcript of Hearing in Case No. 00-F-17 on July 21, 2000, p. 11, lines 7-24, and p. 12, lines 1-5. Thereafter, at a pre-trial motion hearing on August 1, 2000, the Court again addressed the plea offers that had been extended to the defendant.

THE COURT: . . . Okay, now, what offers have been made?

MR. VANDEVENDER [P.A.]: Your Honor, originally the State made an offer to plead to certain counts of the indictment totaling thirty years minimum. The State reduced - -

THE COURT: A minimum or a maximum of thirty?

MR. VANDEVENDER: A minimum. The State reduced that to twenty-five years and then took that off the table.

However, I've informed Mr. Galford that, if that is accepted today, that is back on the table. But after today, the State has no desire to enter a plea.

THE COURT: Now, the reason I'm asking you these questions is because, a lot of times when offers are made and then someone goes to trial and they're convicted and they're sentenced to a huge amount of time, they come back and say that no one told them there was an offer made. So that's why I'm telling you right now so we can take it down so everybody will know that this offer's been made and that you've thought about it.

But as I understand, the State has offered for you to choose any of these crimes that you want to plead to that would total a minimum of twenty-five years. Okay?

You can choose, I suppose, which of these crimes that you want to plead that would total twenty-five years.

Now, I can tell you, just by looking at this indictment, you're probably facing probably two hundred and fifty to three hundred years, if you're convicted of these crimes; and I can also tell you that I've always sentenced to the maximum in cases of this type.

So, what you're gambling or what you're finding out is that you can guarantee a minimum of twenty-five years by entering your plea or you can take the chance on being sentenced to a hundred and fifty or two hundred years and never getting out of prison if you are convicted and don't take the plea.

Do you understand that?

CIVIL ORDER BOOK ___195___ PAGE _625_
ENTERED ___8-15-13___

31

- 292 -

THE DEFENDANT: Yes, sir.

THE COURT: Have you thought about that?

THE DEFENDANT: Yes, sir.

THE COURT: Have you had time to discuss it with your lawyer before you decide what to do?

THE DEFENDANT: No, sir. I'm not pleading to something that I didn't do.

THE COURT: All right. I just want to make sure that it's on the record that that was offered and that you turned it down.

Transcript of Hearing in Case No. 00-F-17 on August 1, 2000, p. 22, lines 13-24; p. 23, lines 1-24; p. 24, lines 1-15. Finally, on the first day of trial, August 8, 2000, the Court again addressed the plea offers with the Petitioner one last time.

MR. VANDEVENDER [P.A.]: . . . On Thursday morning, I'd called Mr. Galford and offered the Defendant a plea to two counts of the indictment for a total of fifteen years.

THE COURT: Fifteen minimum?

MR. VANDEVENDER: Minimum, yes, sir, and offered to make that a Kennedy plea where he could simply plead guilty and not enter any facts into evidence on his own other than what the State enters; and that was good last week, and Mr. Galford turned that down on behalf of his client at 4 p.m., on Thursday.

THE COURT: N        was that agreement conveyed to you? You know you have the opportunity to plead to two counts with a fifteen year to what - - a fifteen year minimum to thirty?

MR. VANDEVENDER: It would have been, I believe, forty-five maximum.

THE COURT: Fifteen to forty-five, and you had a chance to go over that agreement - - or offer - - and discuss it with your lawyer?

THE DEFENDANT: Yes, sir.

CIVIL ORDER BOOK 195 PAGE 626

ENTERED 8-15-13

32

-293-

THE COURT: And you have rejected that; is that correct?

THE DEFENDANT: Yes, sir.

Transcript of Hearing in Case No. 00-F-17 on August 8, 2000, p. 13, lines 20-24, p. 14, lines 1-18. After further discussion by the Court with the Petitioner regarding the plea, Mr. Galford took five-minutes to again discuss the plea offer with the Petitioner. After that recess, the Petitioner again stated on the record that he rejected the plea offer. Transcript of Hearing in Case No. 00-F-17 on August 8, 2000, pp. 14-16.

As evidenced by the transcripts of the proceedings in the underlying criminal case, the Petitioner decided to reject the plea offers made by the State, despite repeated communication and explanation of those offers. Mr. Galford is now deceased and cannot testify regarding his efforts to communicate the plea offers to the Petitioner or to explain the *Kennedy* plea. However, the Petitioner represented to the Court at the pre-trial hearings in Case No. 00-F-17 that his counsel had communicated the offers to him and that he understood the terms of the offers. Moreover, the record makes clear that even if Mr. Galford did not fully explain the plea offers to the Petitioner, the offers were fully communicated to the Petitioner during the pre-trial hearings in Case No. 00-F-17.[23]

For these reasons, the Court finds that Petitioner failed to prove that Mr. Galford was deficient in informing him of plea offers or in explaining the offered *Kennedy* plea to him. Additionally, even if Mr. Galford had acted incompetently, Petitioner failed to establish any prejudice by showing that the outcome of the plea process would have been different with

---

[23] As further evidence that the Court fully explained the plea offers to the Defendant, the Petitioner actually argued in his Fifth Claim in the Amended Petition that he should be entitled to habeas corpus relief because the Court tried to get him to take a plea and, in sentencing, punished him for failing to take a plea.



competent advice. The evidence in this case shows that all plea offers, including the *Kennedy* plea, were communicated and explained to the Petitioner; and the Petitioner knowingly and intelligently refused all plea offers. Accordingly, the Court finds that the Petitioner failed to meet his burden of proving that he is entitled to habeas corpus relief.

Based on the foregoing findings of fact and discussion, this Court now concludes as a matter of law that the Petitioner's claims for a new trial are without merit. The Court finds that the Petitioner has failed to meet his burden of proving that he is entitled to habeas corpus relief.

Accordingly, the Court does hereby **ORDER** that:

1.      Petitioner's remaining grounds in the Petitioner's Amended Petition and Pro-Se Amended Petition are **DENIED**; and

2.      The Writ of Habeas Corpus sought by the Petitioner is refused; and

3.      It is further **ORDERED** that this case is hereby **DISMISSED** from the docket of this Court.

4.      If the Petitioner desires to appeal this dismissal to the Supreme Court of Appeals of West Virginia, the Petitioner shall file with this Court a properly completed Notice of Appeal pursuant to the RULES OF APPELLATE PROCEDURE; and, if necessary, a properly completed Application To Proceed *In Forma Pauper* and Affidavit as set forth in Appendix B of THE RULES GOVERNING POST-CONVICTION HABEAS CORPUS PROCEEDINGS. These materials are to be filed with the Office of the Clerk of the Supreme

Court of Appeals of West Virginia no later than thirty (30) days from the entry of this Order.

5. **This is a Final Order.** The Clerk of the Circuit Court shall remove this matter from the docket and send a certified copy of this Order to: Danny _____ , Mt. Olive Correctional Complex, 1 Mountainside Way, Mt. Olive, WV 25185; Gregory L. Ayers, Office of the Public Defender, P.O. Box 2827, Charleston, WV 25330; and James R. Milam, II, Nicholas County Prosecuting Attorney, 511 Church Street, 203 Courthouse Annex, Summersville, WV 26651.

ENTER: 8-15-13

Hon. Gary L. Johnson, Circuit Judge

STATE OF WEST VIRGINIA, ex. rel.
DANNY

Petitioner,

v.                                                                  CIVIL ACTION NO. 02-C-13

DAVID BALLARD, Warden,
MT. OLIVE CORRECTIONAL COMPLEX,

Respondent.

## ORDER DENYING PETITIONER'S MOTIONS

This matter came before this Court on the 22nd day of May, 2013, for an evidentiary hearing on Petitioner's petition for a writ of habeas corpus. The Petitioner, Danny appeared in person and *pro se*; the Respondent appeared by and through its attorney, James R. Milam, II; and also appearing were Gregory L. Ayers and Crystal L. Walden, from the office of the Public Defender of Kanawha County.

This Court is entering a separate order, of even date herewith, ruling on Petitioner's requested habeas corpus relief. Additionally, at the hearing on May 22, 2013, the Court heard counsel's Motion to Withdraw [Doc. No. 174], to which Petitioner had no objection. Therefore, Mr. Ayers prepared a separate Order Granting Motion to Withdraw as Counsel, which was entered on June 17, 2013 [Doc. No. 177].

At the hearing on May 22, 2013, the Court heard and considered numerous motions filed or made orally by the Petitioner, *pro se*. Thereafter, on July 11, 2013, Petitioner filed an additional motion. The Court rules on each of the Petitioner's motions as follows:

CIVIL ORDER BOOK __195__ PAGE __584__
ENTERED __8-15-13__

-251-

## 1. Motions Filed Following Evidentiary Hearings

Following the evidentiary hearings held on February 27, 2007, and April 20, 2007, and this Court's extended briefing schedule set forth in its order entered on June 13, 2007, Petitioner's brief on his grounds for habeas relief was due on or about August 30, 2008. Petitioner never filed a brief. However, on September 11, 2008, the Petitioner filed the following four (4) motions, *pro se* [Doc. No. 158]:

### a. Motion for a "Stay" in the Proceedings

Petitioner moves for a stay in the proceedings, pending the grant of the contemporaneously-filed motions (discussed below), "to insure the exhaustion requirement of State habeas corpus proceedings." As discussed in the following paragraphs, the Petitioner is not entitled to the relief requested in the motions. Therefore, no stay of the proceedings is warranted beyond the extension granted by the Court in its "Order Granting Extra Time to Obtain Transcripts and Setting New Briefing Schedule", entered on June 13, 2007. Accordingly, the Motion for a "Stay" in the Proceedings is **DENIED**.

### b. Motion to Hire Independent Expert

Petitioner moves the Court for an order permitting Petitioner to hire an independent expert of his choosing to review all of the forensic evidence in this case, with such expert to be paid through the West Virginia State Public Defender's funds. At the Status Conference held in this case on March 26, 2013, the Court addressed Petitioner's request for an independent expert. Petitioner's stand-by counsel, Crystal Walden of the Kanawha County Public Defender Corporation, explained that Petitioner has already had the opportunity to have the serology evidence tested by independent laboratories and that, based on those test results, counsel (in the underlying criminal case and in this habeas corpus proceeding) have

made the strategic decision either to not introduce the evidence or to not raise the serology issues. Accordingly, at the hearing on March 26, 2013, this Court stated on the record that it would not pay for any more experts, but that Petitioner could have another evidentiary hearing to put on any additional serology evidence he desired.[1] That third and final evidentiary hearing was held on May 22, 2013.

The West Virginia Supreme Court of Appeals has held that a defendant has the absolute right to ask for DNA testing. However, a defendant does not have an absolute right to have DNA testing conducted. Syl. Pt. 7, *State ex rel. Burdette v. Zakaib*, 224 W. Va. 325, 685 S.E.2d 903 (2009). The Court explained that, "[i]n order to have the right to additional DNA testing, the evidence sought to be tested must likely produce an opposite result if a new trial were to occur, and the evidence cannot be such that its purpose is merely to impeach or discredit a State's witness." Syl. Pt. 6, *Id.* Although the Petitioner in this case argues that he is seeking appointment of an expert and not re-testing of the forensic evidence, this Court believes that the same principles apply. The serology evidence in this case has been tested by independent laboratories on more than one occasion, and the results of those tests corroborate

---

[1] *See* Transcript of Hearing on March 26, 2013, p. 7, lines 12-17:

> MS. WALDEN: We - - It's been tested on more than one occasion. Mr.
> was not happy with the - - the company, and this is prior to my
> joining the case - -
> THE COURT: Um-hm.
> MS. WALDEN: - - but M           was not happy with what former counsel
> - - the expert they picked, so . . .

And the following exchange also took place at that hearing:

> MS. WALDEN: If - - If I may protect the record, not only was it tested once,
> it was tested twice. It was also submitted to the chief defender of our office,
> who is also an expert in DNA. George Castelle reviewed it, and he offered
> an opinion as to the expert's opinion, giving us advice as to whether or not
> what we sought out on the second time that it was tested was, in fact,
> accurate, because N         had issue and so - -
> THE COURT: Well, what we'll do is, he's entitled to a serology hearing,
> and we'll have that, and he - - and, you know, everything - - I'm not paying
> for any more experts. Everything's been tested, and you can put on any evid
> - - - any evidence that you want, and - -

*See also* Transcript of Hearing on March 26, 2013, p. 10, lines 7-19.

the testing results produced by the West Virginia State Crime Lab. Any independent expert hired by Petitioner would only be reviewing and testifying as to these results. Therefore, such an expert would not be introducing any evidence of "an opposite result if a new trial were to occur." *See, id.* The only purpose for such an independent expert would be to impeach the State's witnesses. *See, id.* Accordingly, the Court finds that Petitioner is not entitled to another expert, and his Motion to Hire Independent Expert is **DENIED**.

### c. Motion for Additional Habeas Corpus Hearing

Petitioner moves the Court for an additional habeas corpus hearing to take evidence from the aforementioned independent expert. Petitioner states that he needs an additional, evidentiary hearing to take further testimony in addition to the testimony taken at the two (2) prior hearings on February 27, 2007, and April 20, 2007. As a basis for his request, Petitioner claims that testimony taken at the two (2) prior hearings shows that the serology evidence presented at trial was incorrect or even "purposefully contaminated". This Court does not agree.

The testimony and evidence presented at the evidentiary hearings in this case corroborates the serology evidence presented at trial.[2] Moreover, Petitioner had a full opportunity to subpoena witnesses and take testimony at the two (2) prior hearings. Additionally, the hearing on May 22, 2013, was noticed as an evidentiary hearing, and the Petitioner had a third opportunity to take any necessary testimony. Accordingly, the Petitioner is not entitled to another hearing in this matter, and the Motion for Additional Habeas Corpus Hearing is, therefore, **DENIED**.

---

[2] For a more detailed explanation of how the evidence at the evidentiary hearings on February 27, 2007, and April 20, 2007, corroborated the serology evidence presented at trial, see pages 20-26 of this Court's Final Order Denying Writ of Habeas Corpus and Dismissing Case, of even date herewith.

#### d. Motion for Rescheduling and Filing Briefs

Finally, Petitioner moves the Court to reschedule the filing of his brief in this case. He states that he cannot submit a brief until he has the above-requested evidentiary hearing with an independent expert. He further asserts that he needs to obtain the transcripts of all evidentiary hearings prior to preparing his brief.

As the Court has herein found Petitioner is not entitled to an independent expert or an additional hearing, there is no necessity to continue the previous briefing schedule set forth in this Court's "Order Granting Extra Time to Obtain Transcripts and Setting New Briefing Schedule", entered on June 13, 2007. In accordance with that order, the Petitioner received transcripts of the two (2) prior hearings on or about July 30, 2008, and therefore, had until on or about August 30, 2008, to file his brief. The Petitioner never filed a brief, and he has not stated any good cause for failing to file his brief or for an extension of the briefing schedule.

For the foregoing reasons, the Motion for Rescheduling and Filing Briefs is **DENIED**.

### 2. Motion in Leave of Court to "Reconstruct the Record"

On March 19, 2013, Petitioner filed a motion [Doc. No. 166] pursuant to Rule 80(e) of the West Virginia Rules of Civil Procedure, for the Court to set a date and hold a hearing to reconstruct portions of the record with respect to portions of Petitioner's criminal trial and habeas corpus proceedings. For instance, Petitioner states that a whole line of questions and answers are missing from the transcript of one of the habeas corpus evidentiary hearings. Petitioner also states that a portion of the trial record is inaudible.

The Rule cited by petitioner, Rule 80(e), provides, in its entirety:

> **(e) Use of Statement of Evidence in Lieu of Transcript.** In the event a stenographic or mechanical report of the proceedings

had and testimony taken at a hearing or trial before the court was not made or in the event a reporter's stenographic or mechanical record thereof has become lost or a transcript thereof is not obtainable, any party to the action may prepare a statement of the proceedings from the best available means, including the party's recollection, for use instead of a transcript thereof. The statement shall be served upon all other adverse parties within a reasonable time after the hearing or trial, and the adverse parties may serve objections or amendments thereto within 10 days after service of the statement upon them. Thereupon the statement, with the objections or proposed amendments, shall be submitted to the court for settlement and approval and when and as settled and approved such statement becomes a part of the record when it is signed by the judge and filed with the court.

W. Va. R.Civ. Pro., Rule 80(e) (emphasis added). The relief requested by the Petitioner is not contemplated by Rule 80(e). Namely, in the present case and in the underlying criminal case, a report of all hearings and trials was made. None of those reports are lost, and transcripts of those proceedings are available. Therefore, there is no need to create or use a statement of the proceedings in lieu of a transcript. Furthermore, even if transcripts were not available, no part of Rule 80(e) or any other rule requires the Court to re-conduct hearings or proceedings for the purpose of reconstructing testimony. Accordingly, Petitioner's motion in Leave of Court to "Reconstruct the Record" is **DENIED**.

3. **Motion for "Re-Scheduling & Continuance" of Hearing**

On March 19, 2013, the Petitioner also filed a motion requesting a continuance of the status hearing set for March 26, 2013 [Doc. No. 168]. In his motion, Petitioner states that he wants to put on evidence to fully address all matters pending; that such evidence would take a minimum of two (2) hours; that he wants to talk to the Prosecuting Attorney prior to such hearing; and that he would not be prepared to proceed with an evidentiary hearing on March 26, 2013.

CIVIL ORDER BOOK _195_ PAGE _589_
ENTERED _8-15-13_

6

As the hearing on March 26, 2013, was only set for purposes of a status conference, Petitioner's motion is **DENIED** as moot. The Petitioner was not required to present any evidence at the hearing on March 26, 2013, and he had ample opportunity to talk to the Prosecuting Attorney and prepare for the full evidentiary hearing that was held on May 22, 2013. Moreover, the Petitioner had already had an opportunity to present evidence at two (2) prior evidentiary hearings on February 27, 2007, and April 20, 2007.

### 4. Oral Motion for Court-Appointed New Counsel

At the hearing on May 22, 2013, Petitioner made an oral motion for new court-appointed counsel. In support of his position, Petitioner inaccurately relied upon *Losh v. McKenzie*, 166 W. Va. 762, 277 S.E.2d 606 (1981) and *Markley v. Coleman*, 215 W. Va. 729, 601 S.E.2d 49 (2004)[3] for the proposition that counsel must raise every ground that Petitioner wants raised in his case. Neither case supports Petitioner's position. *Losh* does recognize that a prisoner is entitled to "a full and fair opportunity with the assistance of counsel to litigate all issues at some stage of the proceeding." *Losh*, 166 W. Va. at 766-767, 277 S.E.2d at 610. However, *Losh* makes clear that the only grounds that should be raised are those that are "applicable" to the petitioner's case. *See, e.g., Id.* 166 W. Va. at 767, 277 S.E.2d at 611 ("counsel should discuss with the prisoner every potential ground . . . which is conceivably applicable to his case") (emphasis added); *Id.,* 166 W. Va. at 770, 277 S.E.2d at 612 ("We do not envisage that in any case more than a few of these grounds will be applicable to the

---

[3] Based on the transcript of the hearing on May 22, 2013, the Petitioner actually referred to a "Supreme Court" case with the case name of "Martin v. Coleman" from 2006 for his position that it is not counsel's decision to decide whether or not the grounds raised in a habeas corpus petition are frivolous. Transcript of Hearing on May 22, 2013, p. 20, lines 10-14. This Court could not find a 2006 habeas corpus case from either the United State Supreme Court or the West Virginia Supreme Court with the name Martin v. Coleman, or any variation thereof. After conducting a thorough search, this Court believes that the accurate cite referred to by the Petitioner was *Markley v. Coleman*, 215 W. Va. 729, 601 S.E.2d 49 (2004).

CIVIL ORDER BOOK \_\_195\_\_ PAGE 590

7

ENTERED \_\_8-15-13\_\_

—257—

underlying criminal proceeding. . . . The Court can, however, inquire on the record whether counsel discussed all grounds which might <u>apply</u> to petitioner's case. . .") (emphasis added). *Losh* does not require counsel to raise every ground requested by a petitioner when counsel does not believe that such grounds are applicable or that he or she could raise such grounds in good faith.

As members of the West Virginia State Bar, Petitioner's counsel (whether prior counsel or any future counsel) are bound by the Rules of Professional Conduct, which provide, among other things, that:

> A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis for doing so that is not frivolous . . .

Rule 3.1, Rules of Professional Conduct. Additionally, the West Virginia Rules of Civil Procedure specify that:

> By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief formed after an inquiry reasonable under the circumstances,
>
> (1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;
>
> (2) <u>the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument</u> for the extension, modification, or reversal of existing law or the establishment of new law;
>
> (3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

-258-

> (4) the denials of factual contentions are warranted on the
> evidence or, if specifically so identified, are reasonably based
> on a lack of information or belief.

W. Va. R. Civ. Pro., Rule 11 (emphasis added). Any attorney appointed to represent a prisoner on a petition for habeas corpus relief is bound by these rules and, therefore, may only raise the grounds for relief that he or she believes, in good faith, to be nonfrivolous.

In the present case, the Court noted on the record that Mr. Ayers and Ms. Walden of the Kanawha County Public Defender's Office are Petitioner's fourth, court-appointed counsel in this case. Petitioner has had ample opportunity to be represented by competent counsel in these proceedings. Mr. Ayers and Ms. Walden represented to the Court that they did not believe that they could, in good faith, raise any additional issues, as they are bound by the rules of ethics.[4] Accordingly, Petitioner was given the opportunity to pursue those issues *pro se*, and he is not entitled to new, court-appointed counsel.

## 5. <u>Motion to "Revert" and for Appointment of Counsel</u>[5]

Subsequent to the last hearing, on July 11, 2013, Petitioner filed a motion [Doc. No. 179] seeking an order "reverting" his case to "a beginning state" in addition to seeking appointment of new counsel and retention of an expert. Petitioner's requests set forth in the motion are duplicative of his previously filed motions and have already been addressed herein. Petitioner's request for new, court-appointed counsel is addressed and denied for the

---

[4] *See, e.g.,* Transcript of Hearing on February 27, 2007, p. 5.

[5] The complete caption on Petitioner's motion is "Motion for Order to 'Revert' Petitioner's Current Habeas Corpus Case and Motion for the Appointment of Effective Assistance of Habeas Counsel with Petitioner As Co-Counsel, With Order Upon Counsel to Raise '*All*' of Petitioner's Constitutional Violation Claim's [sic] in An Additional Amended Petition; and Assist Petitioner in Representing His 'Evidence & Exhibits' To the Court in An '<u>Additional</u>' Omnibus Habeas Corpus Evidentiary Hearing(s), in the Effort to Exhaust [All] His Claim's [sic] on Ineffective Assistance of Trial Counsel and His Zain III Issues '<u>*Unreliability of the DNA Evidence*</u>'" (emphasis included).

reasons set forth in Section 4, above. Petitioner's request to hire an expert is addressed and denied for the reasons set forth in Section 1.b., above. This matter has been open and ongoing for eleven (11) years; Petitioner has had the benefit of four (4) different, court-appointed counsel throughout; this Court has conducted three (3) evidentiary hearings; and Petitioner has failed to comply with briefing schedules entered by this Court. Accordingly, the Petitioner is not entitled to have this case "reverted" to "a beginning state" and is not entitled to the relief requested in the motion. For the foregoing reasons, Petitioner's Motion to "Revert" and for Appointment of Counsel is **DENIED**.

Now, therefore, for all of the foregoing reasons, the Court does hereby **ORDER** that:

1.      Petitioner's Motion for "Stay" in the Proceedings [Doc. No. 158] is **DENIED**; and

2.      Petitioner's Motion to Hire Independent Expert [Doc. No. 158] is **DENIED**; and

3.      Petitioner's Motion for Additional Habeas Corpus Hearing [Doc. No. 158] is **DENIED**; and

4.      Petitioner's Motion for Rescheduling and Filing Briefs [Doc. No. 158] is **DENIED**; and

5.      Petitioner's Motion in Leave of Court to "Reconstruct the Record" [Doc. No. 166] is **DENIED**; and

6.      Petitioner's Motion for 'Re-Scheduling & Continuing' Hearing [Doc. No. 168] is **DENIED** as moot; and

7.      Petitioner's oral motion for new counsel is **DENIED**; and

—2/60—

8. Petitioner's Motion to "Revert" and for Appointment of Counsel [Doc. No. 179] is **DENIED**.

9. **This is a Final Order**. If the Petitioner desires to appeal this matter to the Supreme Court of Appeals of West Virginia, the Petitioner shall file with this Court a properly completed Notice of Appeal pursuant to the RULES OF APPELLATE PROCEDURE; and, if necessary, a properly completed Application To Proceed *In Forma Pauper* and Affidavit as set forth in Appendix B of THE RULES GOVERNING POST-CONVICTION HABEAS CORPUS PROCEEDINGS. These materials are to be filed with the Office of the Clerk of the Supreme Court of Appeals of West Virginia no later than thirty (30) days from the entry of this Order.

10. It is further **ORDERED** that the Clerk of the Circuit Court shall send a certified copy of this Order to: Dan                    Mt. Olive Correctional Complex, 1 Mountainside Way, Mt. Olive, WV 25185; Gregory L. Ayers, Office of the Public Defender, P.O. Box 2827, Charleston, WV 25330; and James R. Milam, II, Nicholas County Prosecuting Attorney, 511 Church Street, 203 Courthouse Annex, Summersville, WV 26651.

ENTER: 8-15-13

Hon. Gary L. Johnson, Circuit Judge

CIVIL ORDER BOOK 195 PAGE 594
ENTERED 8-15-13

11